[No. G029574. Fourth Dist., Div. Three. Mar. 28, 2003.]

DONALD R. RODEN, Plaintiff and Respondent, v.
BERGEN BRUNSWIG CORPORATION, Defendant and Appellant.

622

**COUNSEL**

Paul, Hastings, Janofsky & Walker, Howard C. Hay, Donald L. Morrow, Paul W. Cane and Laura A. Forbes for Defendant and Appellant.

Jeffer, Mangels, Butler & Marmaro, Paul R. Hamilton and Herbert A. Bernhard for Plaintiff and Respondent.

## Opinion

**MOORE, J.**—The parties to a hastily drawn Code of Civil Procedure section 998[1] settlement agreement found themselves in litigation concerning its meaning. After numerous motions, hearings and court orders, the defendant filed an appeal from an order interpreting the judgment encapsulating the section 998 settlement agreement. The defendant requests this court to resolve once and for all just one issue out of the portly ball of wax previously at issue in this complex employment litigation: Does the lump sum payment required by the judgment include an amount for retirement benefits, or are continuing retirement benefits to be provided to the plaintiff under the judgment provision requiring the defendant to continue employment benefits? The judgment is clear and unambiguous. Paragraph 2 thereof requires the defendant to continue to provide specified employment benefits, including retirement benefits, to the plaintiff. Consequently, the amount the defendant is required to pay as a lump sum under paragraph 1 of the judgment does not resolve the defendant's liability with respect to the plaintiff's retirement benefits. We affirm the postjudgment order.

I

### Facts

Donald R. Roden (Roden) was hired as president and chief operating officer of Bergen Brunswig Corporation (Bergen) in 1995 and he became president and chief executive officer in 1997. Roden and Bergen signed an employment agreement in 1995. It provided Bergen could not terminate Roden, except for cause, or upon three years' notice, and provided substantial damages to Roden on termination without cause.

On November 3, 1999, Bergen terminated Roden, without cause. For some time, Bergen continued paying Roden his salary and continued his participation in company benefit plans. Roden filed suit against Bergen, for breach of contract, intentional interference with prospective economic relations, slander, intentional infliction of emotional distress, and other causes of action. Roden sought not only benefits due under his employment agreement, but also damages in connection with Bergen's purported false communications to prospective business relations and others regarding Roden's alleged mismanagement of Bergen.

The parties developed strained relations and were interested in resolving Bergen's remaining financial obligations under the employment agreement

---

[1] All subsequent statutory references are to the Code of Civil Procedure unless otherwise stated.

in less than three years. Bergen had a special incentive to resolve the matter quickly, since it was obligated to pay Roden's attorney fees in the event of a dispute under the employment agreement, pursuant to subsection 13(d) thereof. The parties discussed reducing certain benefits to present value. After lengthy negotiations, Bergen made a section 998 settlement offer and Roden accepted it.

The rancor only increased thereafter. Bergen had dashed off a stunningly brief offer. After Roden had accepted it, Bergen realized what petty few terms were contained therein and that more needed to be said, to make certain the parties agreed as to all the points not articulated in the offer. Roden resisted any attempts at clarification and filed an application for entry of judgment. Roden prevailed on that application.

Bergen followed with a motion to set aside the judgment, which was denied. Roden later filed a motion to enforce the judgment, and the court entered an order favorable to Roden. Bergen filed a motion for reconsideration, which was denied, and then an appeal from the order interpreting the judgment.

II

DISCUSSION

A. *Principles of Interpretation and Standard of Review*

We apply general contract principles to the interpretation of a section 998 judgment. (*Lanyi v. Goldblum* (1986) 177 Cal.App.3d 181, 184 [223 Cal.Rptr. 32].) " '[A] stipulation or consent judgment, being regarded as a contract between the parties, must be construed as any other contract. [Citations.] . . .' [Citation.]" (*Id.* at p. 184, fn. 3.)

In the interpretation of the contract, "parol evidence is only admissible if the contract terms are ambiguous. [Citation.]" (*Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 554 [32 Cal.Rptr.2d 676].) "The decision whether to admit parol evidence involves a two-step process. The first is to review the proffered material regarding the parties' intent to see if the language is 'reasonably susceptible' of the interpretation urged by a party. [Citation.] If that question is decided in the affirmative, the extrinsic evidence is then admitted to aid in the second step, which involves actually interpreting the contract. [Citation.]" (*Ibid.*)

In reviewing the trial court's construction of the contract, and thus its interpretation of the judgment, several different standards of review may

apply, if a party offers parol evidence to aid in interpretation. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165-1166 [6 Cal.Rptr.2d 554].) "On appellate review, the trial court's threshold determination of ambiguity is a question of law [citation] and is thus subject to our independent review [citation]." (*Appleton v. Waessil, supra,* 27 Cal.App.4th at pp. 554-555.) If parol evidence is admitted and is in conflict, the substantial evidence test applies. (*Id.* at p. 556.) "However, when . . . the competent parol evidence is not conflicting, construction of the instrument is a question of law, and the appellate court will independently construe the writing. [Citation.]" (*Winet v. Price, supra,* 4 Cal.App.4th at p. 1166.)

B. *Analysis*

 1. *Language of Offer and Employment Agreement*

Bergen's June 30, 2000 settlement offer, which Roden accepted, provided in relevant part, "Pursuant to California Code of Civil Procedure Section 998, Bergen Brunswig Corporation hereby offers to have judgment entered on plaintiff's First Amended Complaint on the following terms: [¶] 1. In favor of plaintiff in the amount of $5,000,000, less legally required deductions. [¶] 2. Continuation of the benefits provided in Section 5(d), (e), and (i) of his Employment Contract. [¶] 3. Reasonable attorney fees and costs in an amount to be determined by the Court." Those three terms were reiterated in the judgment.

A number of questions arose as to the scope and interpretation of the judgment. The only issue on appeal is whether benefits payable under Bergen's supplemental executive retirement plan (SERP) were reduced to present value and incorporated into the $5 million lump sum payment under paragraph 1 of the judgment, as Bergen contends, or whether Roden was to have continued SERP participation pursuant to paragraph 2 of the judgment, as Roden contends.

"A contract must be 'interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting' (Civ. Code, § 1636), and where, as here, the contract is in writing, 'the intention . . . is to be ascertained from the writing alone, if possible . . . .' (Civ. Code, § 1639.)" (*Brinton v. Bankers Pension Services, Inc.* (1999) 76 Cal.App.4th 550, 559 [90 Cal.Rptr.2d 469].) In this case, it is not possible to ascertain the intent without looking outside of the settlement contract, to the employment agreement referenced therein.

Subsections 5(d), (e) and (i) of the employment agreement provide as follows: "(d) <u>Employee Benefit Programs</u>. The Executive shall be entitled to

participate in all employee health and benefit programs of the Company from time to time in effect for senior executives of the Company . . . , including, but not limited to, health, life, disability and dental insurance and retirement plan benefit programs, subject to a determination of Executive's eligibility under the terms of said plans and otherwise in accordance with their respective terms. [¶] (e) <u>Automobile Allowance</u>. The Company shall elect to provide to the Executive (1) a minimum automobile allowance of $800.00 per month, . . . or (2), in lieu of an automobile allowance, an automobile which will be owned by the Company. . . . [¶] . . . [¶] (i) <u>Other</u>. The Executive shall be entitled to receive and/or participate in all other benefits and programs made available, from time to time, to other senior executives of the Company . . . ."

The language of the employment agreement is clear. Subsection 5(d) thereof specifically provides that Roden may participate in the company retirement plan benefit programs, and Bergen does not dispute that the benefit at issue is a retirement plan benefit. Inasmuch as paragraph 2 of the judgment requires the continuation of subsection 5(d) benefits, and subsection 5(d) addresses retirement benefits, the resolution of retirement benefits is covered by paragraph 2 of the judgment, not paragraph 1.

### 2. *Extrinsic Evidence*

#### (a) *introduction*

The plain language of the judgment and employment agreement notwithstanding, Bergen asks us to look at extrinsic evidence to interpret the judgment. As Bergen points out, subsection 13(b) of the employment agreement provides that Roden's damages for termination without cause "shall equal, the present value (determined on the date such damages are received) of the compensation the Executive would otherwise have received under this Agreement for the remaining term of this Agreement . . . ." Bergen states that it sought to comply with its subsection 13(b) obligation to pay Roden the present value of three years of posttermination compensation. Bergen also says that, in furtherance of this intention, it calculated the value of Roden's SERP benefits, had he remained employed for another three years, reduced the amount to present value, and included the present value in the $5 million lump sum payment under paragraph 1 of the judgment. It also explains that it did not do the same with the insurance benefits because they could not be reduced to present value. (It does not comment as to why it could not reduce to present value either the total of the insurance premium payments or the automobile allowance.)

Bergen requests us to consider extrinsic evidence showing that Roden was aware of this intention before the section 998 offer and acceptance were filed

with the court and judgment was entered and before the hearing on the motion to set aside the judgment. It argues the evidence is admissible because the settlement agreement is reasonably susceptible to more than one interpretation and the evidence proves that the SERP payment was intended to be included in the lump sum payment. (See *Appleton v. Waessil, supra,* 27 Cal.App.4th at p. 554 [if language is reasonably susceptible of proffered interpretation, extrinsic evidence is admitted to aid in interpretation].)

The evidence Bergen seeks to have considered includes a December 29, 1999 section 998 offer that had been rejected, certain correspondence between the parties both before and after the June 30, 2000 section 998 offer was accepted, certain declarations, and excerpts from the transcript of the hearing on the motion to set aside the judgment. The trial court rejected most of the evidence based on relevance or hearsay grounds or on Evidence Code section 1152.[2] Whether the particular evidentiary rulings as to each individual item of evidence were correct, we need not decide. Even were we to consider all the evidence Bergen sought to put before the court, the outcome would be the same.

(b) *presettlement writings*

On December 29, 1999, Bergen sent Roden a section 998 settlement offer. In that offer, Bergen specifically itemized amounts offered for base salary, bonus and SERP benefits and provided the methods of calculation. The offer included a $1,688,363 lump sum amount for the SERP benefits. In addition, the offer specified that health, life and income protection benefits would be continued in accordance with their terms and Bergen would continue to provide the automobile allowance. It also specifically addressed stock options, attorney fees, Roden's outstanding company loan, and other matters.

By contrast, the June 30, 2000 settlement offer did not mention the SERP benefits as a lump sum, and made no mention of the component parts of the $5 million lump sum or how it was calculated. It simply said Roden would be paid a lump sum and receive in addition a continuation of the benefits specified in subsections 5(d), (e) and (i) of the employment agreement and certain attorney fees. Comparing the two settlement offers, it is reasonable to construe the later one as resolving the SERP benefit issue under the umbrella of section 5 of the employment agreement, because that section addresses retirement benefits. Moreover, the later settlement offer contained no indication that SERP benefits were intended to be excluded from the explicit

---

[2]Evidence Code section 1152, subdivision (a) provides: "Evidence that a person has, in compromise . . . , furnished or offered or promised to furnish money . . . to another who . . . claims that he or she has sustained . . . loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his or her liability for the loss or damage or any part of it."

reference to section 5. Finally, the later offer, unlike the earlier one, made no mention of a lump sum earmarked for SERP benefits.

Next, after the June 30, 2000 settlement offer had been sent, but before it was accepted on July 13, 2000, Bergen sent a letter dated July 10, 2000, to Roden individually, not to his attorney. That letter made no reference to the pending settlement offer, but rather was made in response to a May 31 letter from Roden to Bergen. Enclosed with the July 10, 2000 letter was a check in the amount of $1,980,808.73, representing a total amount of $3,591,493, less certain deductions and offsets. The letter and payment were sent "given [Roden's] request" that Bergen pay him then the full amount owed under the employment agreement. The letter also indicated Bergen's desire to cut off the accrual of further attorney fees. The letter explained that the $3,591,493 amount included $1,880,697 for the SERP benefit. It also mentioned therein the continuation of benefits under subsections 5(d), (e) and (i) of the employment agreement.

There was no explanation of how the July 10, 2000 letter related to the pending June 30, 2000 settlement offer. There was no indication of whether the $3,591,493 amount referenced in the July 10, 2000 letter would be credited to the $5 million lump sum specified in the June 30, 2000 settlement offer if the check were cashed and the June 30, 2000, settlement offer were accepted. There was no hint as to whether the July 10, 2000 letter was intended to be a settlement offer that superseded the June 30, 2000 offer. Last, there certainly was no statement that the $1,880,697 SERP benefit amount, or for that matter any of the other amounts referenced in the July 10, 2000 letter, correlated in any way to the pending offer of June 30, 2000. 'Twas a puzzlement.

(c) *postsettlement writings*

Bergen's chairman, Robert Martini, who had signed the July 10, 2000 letter, provided a retroactive explanation of the correlation in an August 17, 2000 declaration. In that declaration, he stated that his intention was to provide Roden with two alternatives. Roden could either decline the June 30, 2000 offer, accept the check, and continue the litigation (to see if he could obtain a greater total recovery that way), or accept the June 30, 2000, offer "under the terms which Bergen intended, thereby ending the litigation . . . ." Furthermore, Martini's intention with respect to the June 30, 2000 offer was to provide $3,591,493 for settlement of salary, bonus and SERP benefits, plus an additional $1,408,507 to cover all additional claims under Roden's first amended complaint.

If indeed Bergen intended to present alternative offers, why would Roden assume that the deal points contained in the July 10, 2000 offer were

intended to be incorporated retroactively into the provisions of the alternative June 30, 2000 offer? Bergen offers no evidence of any communications made before the June 30, 2000 offer was accepted stating that the $5 million lump sum specified therein, as opposed to the $3,591,493 lump sum referenced in the July 10, 2000 letter, was intended to include an amount for SERP benefits and that the explicit June 30, 2000 settlement offer language concerning the continuation of benefits under section 5 of the employment agreement was intended to exclude the continuation of SERP benefits. ▓ "[W]here a person's words or acts, judged by a reasonable standard, manifest an intent to agree to a certain matter, that agreement is established, regardless of what may have been the person's real but unexpressed state of mind on the subject. [Citations.] Plaintiff's undisclosed intent . . . is simply inadmissible to contradict the comprehensive and broad language of the settlement agreement[] . . . . [Citations.]" (*Brinton v. Bankers Pension Services, Inc., supra,* 76 Cal.App.4th at pp. 560-561.) ▓ Here, Bergen's undisclosed intent to exclude SERP benefits from the continuation of benefits provision contained in paragraph 2 of the judgment cannot be used to contradict the plain language of that provision.

In addition to the Martini declaration, Bergen offers other extrinsic evidence. A series of postacceptance communications between counsel for the parties shows that Bergen suddenly became alarmed at the scanty provisions to which the parties had agreed. There were several issues Bergen sought to address after the fact, only one of which was the SERP benefit. Concerned as to the deal that had been struck, Bergen attempted to bootstrap itself into a better position by "clarifying" the contract terms before the court entered judgment. It sent Roden a letter detailing the provisions as it wished they had been written and telling Roden that if it sought entry of judgment it would be agreeing to the "clarified" terms. Roden rebuffed Bergen's efforts to unilaterally dictate new terms.

We agree with the trial court that the postacceptance communications are irrelevant to the determination of the intent of the parties as of the date of acceptance, and the meaning of the agreement as of that date. (*Pazderka v. Caballeros Dimas Alang, Inc.* (1998) 62 Cal.App.4th 658, 672 [73 Cal.Rptr.2d 242].)

### 3. *Application for Entry of Judgment*

Roden filed an application for entry of judgment. In Bergen's response to the application, it stated there was "absolutely nothing left" to be decided. It also suggested that any remaining issues could be resolved by additional negotiation or noticed motion. Bergen further stated: "On the other hand, if

Plaintiff did not mean to accept the offer as it now has been clarified for him, then there was never a meeting of the minds. Plaintiff is thus free <u>not</u> to file his acceptance, and Bergen will not contend his prior document is enforceable. In that case, Plaintiff can simply take the $3,591,943 payment sent him on July 10 and proceed with the litigation to try to get more." In essence, Bergen attempted to unilaterally dictate that Roden not file the acceptance of the June 30, 2000 settlement offer unless it agreed to the additional terms Bergen provided postacceptance by way of "clarification."

At the hearing on the application, the court remarked that it was "painfully apparent that the judgment itself [had] some terms in it that [needed] to be addressed." However, it had decided "to enter the judgment in accordance with the offer and acceptance, with the understanding that that [was] simply a ministerial act and that both sides would then be able to address any issues they [thought were] still open for discussion, once the judgment [had] been entered." It was made clear at the hearing that Bergen intended to file a motion to set aside the judgment and that the parties had agreed to a briefing schedule. The court granted Roden's application and ordered entry of judgment.[3]

### 4. *Motion to Set Aside Judgment*

Bergen filed its motion to set aside the judgment. In support of that motion, Bergen stated that if Roden understood Bergen's offer as Martini intended, then there was a meeting of the minds and the motion would be withdrawn. Bergen further stated that if Roden had a different understanding, then there was no meeting of the minds, and the judgment was entered based on mistake, inadvertence, surprise, or excusable neglect. The court held a lengthy hearing on the motion.

At the beginning of the hearing, the court remarked that the parties had not briefed the issue of the continuation of benefits under subsections 5(d), (e) and (i) of the employment agreement and inquired as to whether there was any dispute concerning them. Roden's attorney indicated there was no dispute as far as he knew. Bergen's attorney then remarked that the insurance benefits continued in place. The court then said it appeared the parties agreed and there was nothing to be decided in that respect. The parties concurred with the court's assessment.

---

[3]The parties make no argument that the court was without authority to order entry of judgment. (See *Saba v. Crater* (1998) 62 Cal.App.4th 150, 153 [72 Cal.Rptr.2d 401] [§ 998 does not permit courts to resolve disputes concerning terms of settlement].) However, we observe that the court carefully directed that the judgment be entered as a ministerial act, with the adjudication of the dispute to take place afterward. (See *Bias v. Wright* (2002) 103 Cal.App.4th 811, 819 [127 Cal.Rptr.2d 137] [court "not authorized to adjudicate a dispute over the terms of § 998 agreements before entering judgment"].)

Later in the proceedings, the court remarked that, "The 998 offer in the mind of the court . . . offers . . . that a judgment be entered for $5,000,000, minus legally required deductions . . . , plus the continuation of some health and insurance benefits and plus reasonable attorneys' fees and costs to be determined by the court. That's really the extent of it." Later still, the court stated, "It seems to me then . . . , that the continuation of benefits is not in dispute. They're to continue for the length of the time that's contemplated under the employment agreement as expressed in [subsections] 5(d), 5(e) and 5(i). And there appears to be no question or dispute at [this] time as to the nature or duration of those benefits." The court took the matter under submission and ultimately denied the motion.

It would appear that after the ruling each party believed it had prevailed. Roden was content because the judgment had not been set aside. Bergen believed all was well because it had stated from the beginning that if everyone agreed with its interpretation of the June 30, 2000 offer and resulting judgment, then there was no need to set the judgment aside. Based on the above quoted exchange on the record, Bergen thought the motion had been denied because, indeed, everyone agreed with its interpretation. ██ Consequently, Bergen did not file an appeal from the postjudgment order.[4]

 In its opening brief before this court, Bergen argues that in opposing the motion to set aside the judgment, Roden represented to the court "that he understood Bergen's position that the SERP payment was included in the $5 million, . . . and that he was not aware of any dispute on this issue." Bergen cites *Alling v. Universal Manufacturing Corp.* (1992) 5 Cal.App.4th 1412, 1442 [7 Cal.Rptr.2d 718], for the proposition that "[t]he

---

[4]Roden attempts to make much of the fact Bergen did not appeal from either the judgment or the order denying the set aside motion. But Bergen properly challenged the judgment by way of the motion to set aside. (*Pazderka v. Caballeros Dimas Alang, Inc., supra,* 62 Cal.App.4th at pp. 667-668.) As for the minute order on that motion, given the manner in which Bergen's motion to set aside was phrased, the lengthy hearing and the various exchanges on the record, Bergen understandably thought it had gotten the relief sought, i.e., an agreement that the judgment would be interpreted as Bergen thought it should be. When the parties later found out they still disagreed as to the interpretation of the judgment, Roden sought relief. The matter was adjudicated and a formal court order interpreting that judgment was entered. That order contained findings and a detailed interpretation of the judgment that the parties had not received previously. Moreover, the order itself stated it was "a final Order as to the matters resolved above, and thus an appealable Order on the date entered." In ascertaining whether a decree is final and appealable, the substance and effect of the adjudication is determinative. (*Belio v. Panorama Optics, Inc.* (1995) 33 Cal.App.4th 1096, 1101 [39 Cal.Rptr.2d 737].) The formal order constituted the final adjudication as to the terms of the judgment addressed therein and there is no reason why Bergen should be barred from seeking appellate review of the order Roden obtained. "We conclude the appeal is proper because the trial court's order . . . 'effectively disposed of the case.' [Citation.]" (*Ibid.*)

principle is well established that once a party has gained an advantage on the basis of specific representations to the trial court, it is not thereafter permitted to disavow its previous representations. [Citations.]"

While the above referenced discussion on the record at the hearing on the set aside motion can fairly be interpreted as Bergen suggests, it need not be. The judge indicated the parties had not specifically briefed subsections 5(d), (e) and (i) of the employment agreement and asked if they had any dispute "about what those constitute. . . ." While Bergen may have thought it evident the court was asking if the parties were in agreement on whether the SERP benefits would be paid out under paragraph 1 of the judgment or paragraph 2 of the judgment, Roden may not have interpreted the question exactly that way. He could have interpreted the question as asking simply whether the parties agreed as to which benefits were addressed in section 5, not how the judgment reference to section 5 was to be interpreted.

Bergen's counsel stated insurance benefits would continue "until the conclusion of the contract in November '02," and Roden's counsel agreed. Bergen, emphasizing the reference to insurance benefits, may have viewed this as Roden's agreement that *only* insurance benefits would continue under paragraph 2 of the judgment. But Roden, focusing on the matter of duration, may have viewed this as simply an acknowledgment that the section 5 benefits, such as insurance, would continue until November 2002.

Moreover, there are other portions of the transcript which may be construed as showing that the parties continued to pass like ships in the night, even at the hearing. Each party indicated a belief that the terms of the June 30, 2000 settlement offer were perfectly clear and that as long as the other agreed, they had a deal. But each party may have thought the other had finally come around to its viewpoint, when in fact neither party had capitulated. This possibility was apparent to the trial court, as reflected in its remarks at a subsequent hearing, which we will discuss below.

5. *Motion to Enforce the Judgment*

Some months after the order denying the set aside motion had been entered, Roden realized that Bergen was not complying with the judgment as he interpreted it. Bergen was taken aback to learn that Roden still viewed the judgment in the same manner as he had before the hearing and felt Bergen was failing to abide by it. Roden filed a motion to enforce the judgment, which Bergen opposed. Where the parties' motions and briefs had previously dealt with a number of unresolved issues arising out of the employment relationship, this time they focused on the SERP benefits to an unprecedented degree, providing much more comprehensive briefing on the issue,

including a discussion of the SERP plan provisions. Bergen's two primary points were that: (1) Roden's attorney had represented in court at the hearing on the motion to set aside the judgment that Roden "did not disagree with what he knew was Bergen's intent and interpretation of [subsections] 5(d), (e), and (i)"; and (2) Roden was not entitled to continued participation in SERP because his employment had terminated. (Underscoring omitted.)

The court held yet another lengthy hearing. At that time, the court explained its viewpoint of the colloquy on the record at the prior hearing on the motion to set aside the judgment. The court stated with reference to subsections 5(d), (e) and (i) of the employment agreement, that "what the provisions say in terms of their *wording* is not disputed. And that's what the court had in mind . . . at the time of that previous hearing." (Italics added.) The court further clarified that it had believed that the *interpretation* of those provisions was going to be a continuing issue and that it had never thought that the parties agreed on the effect and the interpretation of subsections 5(d), (e) and (i).

Ultimately, the court ruled in favor of Roden. In its formal order, the court found that, the way the employment agreement was written, once notice was given that Roden was terminated, his contract nonetheless continued for three years from that point. In other words, irrespective of whether Bergen chose to continue receiving Roden's services, he was treated as if he continued as an executive employee. Thus, he remained eligible for benefits under subsections 5(d), (e) and (i). The court also found that the $5 million lump sum payment required under paragraph 1 of the judgment did not include any of the continued SERP benefits.

## C. *Conclusion*

We cannot say the court erred in its interpretation. The plain language of the judgment and the employment agreement support the postjudgment order. Bergen agreed to pay a $5 million lump sum to get rid of the litigation, and to continue the section 5 employment benefits, including retirement benefits. The language is clear and unambiguous. It is not reasonably susceptible of the interpretation Bergen suggests. Thus, we need not consider Bergen's extrinsic evidence. (*Appleton v. Waessil, supra,* 27 Cal.App.4th at p. 554.) Even were we to do so, however, and were the proffered evidence admissible (a matter we need not decide), the result would be the same.

The presettlement communications may be construed as either helpful or harmful to Bergen's position, but we view them as being more harmful than

helpful. The postsettlement communications are irrelevant. Bergen's postacceptance effort to aggrandize the settlement terms is unavailing. As for the colloquy on the record at the hearing on the set aside motion, the trial court is in the best position to make a finding on the representations of counsel. The record supports the court's conclusion that the parties never really reached agreement at the hearing. It also supports the court's interpretation of the judgment.

We observe that the order interpreting the judgment is consistent with the public policy objectives behind section 998. While this appeal is from the order interpreting the judgment, the underlying dispute centers around a purported lack of meeting of the minds, upon which the motion to set aside the judgment was predicated. No appeal was taken from the order denying that motion, for reasons previously explained, and we are not asked to address whether that motion was properly denied. We nonetheless opine that it was.

■ "When determining whether the trial court has the discretion to grant relief [under Code of Civil Procedure section 473, subdivision (b)], ' ". . . the court inquires whether 'a *reasonably prudent person* under the same or similar circumstances' might have made the same error . . . ." [Citation.]' [Citation.] 'The "reasonably prudent person standard" . . . gives an attorney the benefit of such relief only where the mistake is one which might ordinarily be made by a person with no special training or skill.' [Citation.]" (*Pazderka v. Caballeros Dimas Alang, Inc., supra,* 62 Cal.App.4th at p. 671.) The court in *Pazderka* held an attorney's failure to include a provision regarding attorney fees and costs in the offer to compromise was "not the type of mistake 'ordinarily made by a person with no special training or skill.' " It further stated, "Permitting the court to unravel such agreements based on mistake or evidence of no intent . . . would contravene the policy objectives of section 998." (*Ibid.*)

■ The parallels between the case before us and *Pazderka v. Caballeros Dimas Alang, Inc., supra,* 62 Cal.App.4th 658, are substantial. Here, it would appear the attorney failed to draft a settlement offer that specifically stated whether SERP benefits were to be paid as part of the $5 million lump sum or under the continuation of benefits provision, or for that matter addressed how the company loan to Roden was to be treated. Counsel attempted to clarify the terms postacceptance, just as counsel did in *Pazderka.* Just as in *Pazderka,* the efforts to add more precise terms after the fact were too late.

*Zamora v. Clayborn Contracting Group, Inc.* (2002) 28 Cal.4th 249 [121 Cal.Rptr.2d 187, 47 P.3d 1056] does not change the outcome. In *Zamora,*

a section 998 judgment was properly set aside when the dispute was based on the clerical error of a legal assistant who typed an offer to take judgment "against" the client instead of "in favor of" the client. The court specifically distinguished *Pazderka v. Caballeros Dimas Alang, Inc., supra,* 62 Cal.App.4th 658, in which the error was not clerical error, but attorney error. In summary, the court stated, "[W]e are confident trial courts will exercise this discretionary power to vacate judgments entered pursuant to a settlement agreement both carefully and sparingly. We suspect most, if not all, courts will see through claims of buyer's remorse . . . . [Citation.]" (*Zamora v. Clayborn Contracting Group, Inc., supra,* 28 Cal.4th at p. 261.)

D. *Attorney Fees and Sanctions*

Subsection 13(d) of the employment agreement states: "The Company shall pay to the Executive all reasonable attorneys' fees and necessary costs and disbursements incurred by or on behalf of the Executive in connection with or as a result of a dispute under this Agreement, whether or not the Executive ultimately prevails. . . ." Consequently, the judgment entered against Bergen included, in paragraph 3 thereof, an award of reasonable attorney fees and costs. Roden requests attorney fees on appeal, pursuant to paragraph 3. He is entitled to those fees.

In addition, Roden contends Bergen's appeal is utterly frivolous and suggests that this court, sua sponte, should sanction Bergen. We decline to do so.

### III

### DISPOSITION

The postjudgment order is affirmed. Roden shall recover his attorney fees and costs on appeal.

Rylaarsdam, Acting P. J., and Aronson, J., concurred.