Filed 10/30/14  San Bernardino County Dept. Child Support Serv. v. Sweeney CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| SAN BERNARDINO COUNTY DEPARTMENT OF CHILD SUPPORT SERVICES, | G050249 |
| Plaintiff and Respondent, | (Super. Ct. No. SDASS061379) |
| v. | O P I N I O N |
| JAMES E. SWEENEY, |  |
| Defendant and Appellant. |  |

Appeal from an order of the Superior Court of San Bernardino County, John A. Crawley, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed in part, reversed in part, and remanded.

Edmund L. Montgomery for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie Weng-Gutierrez, Assistant Attorney General, Linda M. Gonzalez and Ricardo Enriquez, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

James E. Sweeney appeals from the trial court's order increasing his child support obligation for his teenage son. He contends the court erred in finding there was no agreement with the child's mother to fulfill his support obligation with goods instead of cash. He also argues the court erred in finding he had monthly income of almost $8,000 while he insisted he was unemployed. These factual challenges have no merit. But as the Department of Child Support Services (DCSS) concedes, the trial court had no jurisdiction to increase Sweeney's support obligation retroactively to March 2008 because DCSS did not file a modification request until February 2012. We therefore remand the matter for the trial court to redetermine the modification date and arrears accordingly.

I

FACTUAL AND PROCEDURAL BACKGROUND

Consistent with the standard of review, we set out the facts in the light most favorable to upholding the order or judgment on appeal. (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 229; see 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 370, pp. 427-428 ["'All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact'"].)

Sweeney and Patty Schabow had a son in 1996, and within two months DCSS filed a paternity complaint against Sweeney to compel him to provide financial support for his child. A default judgment in 1998 established paternity, but set support at zero because Sweeney was incarcerated at the time. When DCSS sought to modify the amount in 2005, Sweeney and Schabow appeared in court and stipulated Sweeney would pay $300 monthly child support, which on DCSS's subsequent motion, increased in 2006 to $550 monthly.

2

In May 2008, the trial court granted Sweeney's motion to reduce his support obligation because he lost his job. The court set monthly support at $301 and calendared a review hearing for the end of June. But on June 24, 2008, the DCSS, Sweeney, and Schabow filed a stipulation with the court in which Sweeney agreed to make a lump sum payment of $25,000 directly to Schabow (Lump Sum Agreement, or LSA), from which she would deduct the ongoing $301 monthly payments. Based on the LSA, Schabow agreed to close her case with DCSS, which ceased providing child support enforcement services.

According to Sweeney, the next day, on June 25, 2008, he and Schabow reached a private agreement in which he gave her or promised to give her $25,000 in goods and cash, consisting of: (1) a truck in lieu of $15,000; (2) $3,500 in checks; plus (3) $1,500 by July 1, and an additional $5,000 "over the next 36 months." Schabow disputed Sweeney's account, later explaining in court that she "never agreed to the truck being part of the $25,000.00." Instead, based on Sweeney's threat to move to Mexico to avoid his child support obligation, she agreed she would help him sell the truck "to make a little bit of money on the side," but not $15,000 or otherwise as a substitute for the $25,000 lump sum Sweeney was supposed to pay her. She testified, "I never agreed to the truck being part of the deal."

Schabow did not attempt to enforce the Lump Sum Agreement immediately. She feared Sweeney's stratagem of "moving to Mexico [where he] did not have a job there and [DCSS] could not enforce anything in Mexico so I would not get any child support." But in June 2011, she reopened her case with DCSS, which initiated enforcement of the parties' stipulated $301 monthly support obligation. Sweeney responded in November 2011 by filing a request for a hearing and order to show cause (OSC) why his private agreement with Schabow should not be enforced. Sweeney claimed he effectively had paid the $25,000 by giving Schabow cash payments and the truck, and therefore owed no additional child support or arrears.

3

In February 2012, DCSS filed a motion to increase Sweeney's child support obligation based on information it discovered in an employment database showing he made almost $8,000 a month. Specifically, DCSS found in a National Directory of New Hires information suggesting Sweeney earned approximately $7,878 monthly in 2009 and 2010, which Sweeney did not dispute. A social worker also explained in a declaration signed under penalty of perjury that Sweeney had amassed $184,000 in his checking account. (See Code Civ. Proc., § 2015.5 [trial court may consider statements signed under penalty of perjury].) The trial court scheduled a hearing for June 2012, and ordered Sweeney to "file a response if you have any attachments that can substantiate where the money [in the checking account] came from."

At the June hearing, Schabow reiterated that "[t]he truck deal had nothing to do with our child support order." She explained that she *paid* Sweeney $5,000 for the truck, and sold it for $6,000. The trial court noted the first page of the purported private agreement substituting the truck for a cash payment lacked signatures or initials. When the trial court surmised the "paid by truck" notation might have been "written in afterwards" by someone, Schabow agreed and emphasized, "All that stuff, I never agreed to the truck being part of the deal." Addressing Sweeney, the court openly doubted the notion Schabow "would rather have that blue truck of yours instead of child support," but noted it "would be very helpful in helping me determine the credibility of the parties" if Sweeney would provide his employment and income history from 2008 through 2012, which the trial court ordered him to produce "in detail." Specifically, the trial court requested Sweeney to submit for the next hearing in October 2012 "where [he] was employed from 1-2008 and if he was not employed, any disability received, unemployment, whether or not he lived off gifts, etc."

Sweeney failed to provide the information. His bank statements showed a balance increase in 2011 from $30,000 to almost $170,000, but he disclosed no source for these funds. Indeed, he later claimed to be unemployed for most of 2011. He ignored the

4

trial court's request for a detailed income and employment history. He did not file an updated income and expense declaration for the October hearing, but an earlier submission claimed $3,415 in monthly expenses and no income.

At the hearing, the court found "the June 25th, 2008, purported agreement . . . invalid." The court explained it found no credibility in Sweeney's supposed explanation of "'[I'm] unload[ing] my truck because I'm going overseas.'" The court rejected Sweeney's claim that Schabow accepted the truck in lieu of cash for child support. The trial court also noted Sweeney hid his substantial 2009-2010 income by "not disclos[ing it] on any documents that were filed," despite the court's request for documentation. Given this history, the adverse credibility finding on the purported truck agreement, and Sweeney's failure to account for his substantial and increasing bank balances, his claim he had no income fell on deaf ears. The trial court found he was not credible. The court concluded the $7,878 monthly income in 2010 represented the "last credible evidence of [Sweeney's] income," and accordingly used that figure to calculate Sweeney's new monthly child support obligation of $1,347. The court made the modified amount retroactive to March 2008, later calculated arrears based on that amount, and Sweeney now appeals.

II

DISCUSSION

Sweeney presumes his purported private agreement with Schabow was valid, and argues the trial court erred in setting it aside. He is mistaken.

As a preliminary matter, Sweeney challenges DCSS's standing to oppose the supposed agreement because he and Schabow entered it at a time when DCSS had closed its enforcement case against Sweeney and was not a party to the new, private agreement. But Sweeney interposed the private agreement as a basis to oppose DCSS's enforcement of the April 2008 stipulation filed in court in which Sweeney, Schabow, *and DCSS* agreed Sweeney's monthly support obligation was $301 and further agreed

5

Sweeney would prepay that amount in a lump sum of $25,000. In other words, Sweeney asserted the agreement as a reason not to enforce a stipulation that included DCSS, and therefore DCSS was an interested party with standing to challenge the agreement. Moreover, when Schabow turned to DCSS to reopen her enforcement case against Sweeney, she by statute assigned her right to child support to DCSS as the local child support agency (Welf. & Inst. Code, § 11477, subd. (a)), including all enforcement rights (see Fam. Code, §§ 17400, 17404, subd. (e)(4) [local child support agency "shall control support and parentage litigation"]). DCSS therefore had ample authority to challenge the agreement.

By asserting the alleged agreement as a defense to enforcement, Sweeney put the validity and terms of the agreement at issue. We review the trial court's interpretation of a contract de novo, except where conflicting extrinsic evidence was admitted, in which case the substantial evidence rule applies. (*Roden v. Bergen Brunswig Corp.* (2003) 107 Cal.App.4th 620, 625.) Where, as here, the extrinsic evidence is in conflict, "and thus requires resolution of credibility issues, any reasonable construction will be upheld if it is supported by substantial evidence." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956 (*Founding Members*).)

Sweeney disagrees with the trial court's factual findings concerning the supposed new agreement. But "[w]ith rhythmic regularity," we must remind some litigants that on appeal "we have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom ." (*Overton v. Vita–Food Corp.* (1949) 94 Cal.App.2d 367, 370, disapproved on other grounds in *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 866, fn. 2.)

The trial court made a fundamental credibility determination that the parties did not mutually understand and agree the truck was a substitute for $15,000 in child

support.  (See *Founding Members*, *supra*, 109 Cal.App.4th at p. 955 ["The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting"].)  Consequently, the purported agreement was not valid to prevent enforcement of Sweeney's child support obligation on the notion the obligation was already satisfied.  The trial court simply believed Schabow and did not believe Sweeney's account that the truck substituted for $15,000 in child support, a credibility determination we may not second-guess.  As set out above, ample evidence supports the trial court's determination, and Sweeney's appellate challenge is therefore wholly without merit.

Sweeney next argues the trial court erred in utilizing "an imputed income based on earning capacity years prior to his disability."  He complains the trial court's calculation of his increased child support obligation was "not based on any current facts," and asserts no evidence showed he "has any ability to earn any income close to his pre-injury ability." We note, however, that Sweeney never testified he was disabled, nor introduced any sworn evidence of his alleged hip or back injuries (Code Civ. Proc., § 2015.5).  The trial court therefore was entitled to disregard any suggestion he was incapable of working, even apart from its conclusion Sweeney lacked credibility.

More to the point, however, the trial court did not impute income to Sweeney.  Imputed income is based on "the earning capacity of a parent in lieu of the parent's [actual] income, consistent with the best interests of the children."  (Fam. Code, § 4058, subd. (b).)  As Sweeney notes, imputed income figures cannot be drawn from "thin air," but must have a tangible evidentiary foundation in a current ability and opportunity to earn the imputed sums.  (*In re Marriage of Bardzik* (2008) 165 Cal.App.4th 1291; *In re Marriage of Cohn* (1998) 65 Cal.App.4th 923.)

But the trial court's calculations reflect the $7,878 monthly income it attributed to Sweeney was "earned income" and the amount of imputed income was "none."  Sweeney complains that no current earning statement reflected the $7,878, but while that is true, the trial court did not err.  Simply put, a child support obligor may not

7

stonewall, obfuscate, or with impunity attempt to mislead the court concerning his or her income levels, and then protest that no evidence supports the trial court's income calculation.

*In re Marriage of Calcaterra & Badackhsh* (2005) 132 Cal.App.4th 28 (*Calcaterra*) is instructive. *Calcaterra* explains that a trial court has broad authority to rely on evidence it finds trustworthy to make findings of income when an obligor lacks credibility. (*Calcaterra*, at p. 36.) There, the trial court found that a support obligor had a monthly income of $27,000.00 based on loan applications, despite income tax returns reflecting monthly income of $1,700. (*Ibid*.) The appellate court held that due to "the huge discrepancy between the tax returns, the 2002 and 2003 loan applications, [the obligor's] income and expense declaration, and testimony, the trial court was not required to accept the statement of income on the tax returns." (*Id*. at p. 35.) *Calcaterra* pointed out that a "'trier of fact may believe and accept as true only part of a witness's testimony and disregard the rest.' [Citation.]." (*Id*. at p. 36.) Despite the obligor's contentions that the 2002 loan application was 22 months old and outdated, the trial court "did not believe him and could reasonably draw the inference that [his] income had not decreased" since then. (*Id*. at p. 35.) *Calcaterra* explained in upholding the trial court's ruling that while "[a] judgment based upon factual truth is a legitimate goal of any judicial proceeding, [n]either the trial court, nor this court, know the true state of [the obligor's] financial affairs. That is [the obligor's] fault." (*Id*. at p. 38.)

The same is true here. Sweeney insists his 2011 tax return showing only income of $2,579 in IRA distributions is dispositive to establish his current income. But as *Calcaterra* explained, a tax return is simply one data point and one that the trial court reasonably may disregard depending on the obligor's credibility. Sweeney never revealed his substantial 2009-2010 income, nor explained the dramatic rise in his 2011 bank account balance from $30,000 to $170,000 *when he claimed he was not working*. The trial court reasonably could conclude Sweeney's strong 2009-2010 income stream

8

continued, though he refused to disclose it. This is particularly true given he claimed in income and expense filings in 2008 that he had zero assets yet, despite the intervening economic downturn, he admitted in 2011 to a social worker (but not in his own court filings) assets of $180,000. This evidence pointed to a substantial, undisclosed income source because the high balance cannot be explained solely by Sweeney's 2009-2010 income, particularly with more than $3,000 in monthly expenses he admitted. Sweeney's lack of credibility put him on thin ice, and his decision to ignore the trial court's request for a detailed income and employment history did not aid his cause. Substantial evidence supports the trial court's income finding.

As DCSS concedes, however, the trial court's order must be reversed in one respect. The Legislature has barred retroactive modification of support obligations accruing before a party files notice of a motion to modify support. (Fam. Code, §§ 3603; 3651, subd. (c)(1); 3653, subd. (a);see *In re Marriage of Tavares* (2007) 151 Cal.App.4th 620, 628-629.)

### III

### DISPOSITION

The trial court's order is reversed insofar as it retroactively modifies Sweeney's support obligation back to March 2008, given DCSS did not file its modification request until February 2012. In all other respects, the order is affirmed. Respondent is entitled to its costs on appeal.


ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


FYBEL, J.