[No. G037365. Fourth Dist., Div. Three. Oct. 12, 2007.]

DONALD R. RODEN, Plaintiff and Appellant, v.
AMERISOURCEBERGEN CORPORATION, Defendant and Appellant.

## COUNSEL

Richard E. Hodge, Inc., Richard E. Hodge and William E. Johnson for Plaintiff and Appellant.

O'Melveny & Myers, Gordon E. Krischer, Adam J. Karr and Christopher W. Decker for Defendant and Appellant.

## OPINION

**MOORE, J.**—This is now the third time these parties have brought their arguments to this court. "The [first] time, we affirmed a postjudgment order interpreting [and implementing] a judgment that entitled Donald R. Roden (Roden) to collect cash and employment benefits from his former employer, Bergen Brunswig Corporation. (*Roden v. Bergen Brunswig Corp.* (2003) 107 Cal.App.4th 620, 623, 625 [132 Cal.Rptr.2d 549] [(hereafter *Roden I*)].)" (*Roden v. AmerisourceBergen Corp.* (2005) 130 Cal.App.4th 211, 213 [29 Cal.Rptr.3d 810] (hereafter *Roden II*).) The second time, we dismissed an appeal from an order permitting postjudgment discovery. (*Roden II, supra,* 130 Cal.App.4th at p. 214.) Now, we address a second postjudgment order interpreting and implementing the judgment.

In his appeal, Donald R. Roden claims the court erred in awarding him only $14,432,141.74 in employment benefits, over and above the $5 million settlement amount previously awarded, and in denying his request for loan forgiveness. In its cross-appeal, AmerisourceBergen Corporation (AmerisourceBergen), successor by merger to Bergen Brunswig Corporation (Bergen),[1] counters that the court erred in awarding the additional $14,432,141.74.

The trial court did not err in determining that Roden was entitled to a change in control benefit under the retirement plan. However, the court did err in calculating the amount of that benefit. The benefit amount must be determined in the first instance by the retirement plan administrator, not by the trial court. It is also the province of the plan administrator to determine in the first instance whether the terms of the retirement plan require the employer to pay excise and/or income taxes with respect to the change in control benefit. To the extent the court made a decision with respect to such taxes, the court erred. However, the court correctly determined that Roden was not entitled to a doubling of his retirement benefit, because the doubling

---

[1] Bergen merged with AmeriSource Health Corporation on August 29, 2001. The resultant entity is known as AmerisourceBergen Corporation.

provision of the retirement plan was unenforceable as a penalty. In addition, the court correctly determined that Roden was not entitled to a severance payment, a stock option award, or a forgiveness of his loan. Finally, while we agree that the trial court had the discretion to enter the order it did with respect to attorney fees and costs, we nonetheless reverse and remand that order for further consideration given the remand of certain other issues in this case.

Accordingly, we affirm the portions of the order holding that Roden was entitled to a change in control benefit, but was not entitled to a doubling of his retirement benefits, a severance payment, a stock option award, or a forgiveness of his loan. We reverse the portions of the order concerning the amount of the change in control benefit, and the amount, if any, of excise and/or income taxes owing to Roden under the retirement plan. We remand those issues to the trial court with directions to further remand them to the plan administrator for determination in the first instance. We also reverse and remand the order pertaining to attorney fees and costs, with directions that the trial court reconsider the matter of the prevailing party in light of this opinion.

I

FACTS

"As discussed in our [first] opinion, Bergen hired Roden as its president and chief operating officer in 1995. [Citation.] Roden later became chief executive officer. Bergen terminated Roden's employment in 1999 and a disagreement ensued concerning Roden's rights under his employment contract and the company's benefit plans. Rancorous litigation followed. [Citation.]" (*Roden II, supra*, 130 Cal.App.4th at p. 214.)

"The matter came to this court on the interpretation of a Code of Civil Procedure section 998 settlement agreement that had been reduced to judgment. The judgment required, inter alia, the payment to Roden of $5 million 'less legally required deductions,' and the continuation of certain benefits as provided in section 5 of Roden's employment contract. [Citation.] We affirmed the postjudgment order at issue. [Citation.] In doing so, we stated, 'Bergen agreed to pay a $5 million lump sum to get rid of the litigation, and to continue the section 5 employment benefits, including retirement benefits.' [Citation.]" (*Roden II, supra*, 130 Cal.App.4th at p. 214.)

"Thereafter, Roden sought to collect the amounts due him under the judgment. However, the parties disagreed as to the amount of the employment benefits to which he was entitled." (*Roden II, supra*, 130 Cal.App.4th at p. 214.) Consequently, Roden filed a motion for a second postjudgment order interpreting and implementing the judgment. He sought an order regarding his rights under the company's supplemental executive retirement plan (SERP), a severance agreement, and certain stock option plans and loan forgiveness plans.

The court awarded Roden $14,432,141.74 in SERP benefits, and denied his requests for severance benefits, stock option benefits, and loan forgiveness. Roden and AmerisourceBergen both appeal.

II

DISCUSSION

A.  *INTRODUCTION:*

Roden claims the court erred in failing to (1) double the amount of his SERP benefit; (2) award him excise and income taxes that may be payable with respect to his change in control benefit under the SERP; (3) award him a severance payment; (4) award him a stock option benefit; (5) order AmerisourceBergen to forgive his $337,500 company loan; and (6) award him attorney fees and costs.

In support of his arguments, Roden has filed a motion to augment the record with a copy of a July 7, 2006 minute order and to file a 12th volume of the appellant's appendix containing a copy of that order. That motion is hereby granted.

AmerisourceBergen maintains that the court should not have awarded Roden $14,432,141.74 in SERP benefits. It contends the court erred in (1) awarding Roden a change in control benefit under the SERP; (2) calculating the amount of that benefit; and (3) awarding interest on that benefit from the date of the merger.

We address the parties' arguments in turn.

B.  *SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN:*

(1)  *Background*

(a)  *Applicable documents*

At issue in the case before us are two documents relative to Roden's claim for retirement plan benefits. The first is the SERP. The second is the "Master

Trust Agreement for Bergen Brunswig Corporation Executive Deferral Plans," dated December 27, 1994 (Master Trust Agreement). Section 10.5 of the Master Trust Agreement states: "The Trust and the Plans are parts of a single, integrated employee benefit plan system and shall be construed together."

As indicated in section 1.2 of the Master Trust Agreement and sections 9.2 and 9.3 of the SERP, the trust under the Master Trust Agreement was set up to provide a funding vehicle in connection with certain Bergen executive deferral plans, including the SERP. However, there was no guarantee that the trust would be funded sufficiently to pay all benefits claims under the SERP. To the extent funding was insufficient, Bergen's unsatisfied obligations under the SERP would remain. As section 9.2 of the SERP provides: "Bergen . . . shall establish the Trust, and the Adopting Employers shall at least annually transfer over to the Trust such assets as the Adopting Employers determine, in good faith, are necessary to provide for each Employer's future liabilities created under this Plan. Whether or not an Employer funds the Trust, it shall at all times remain liable to carry out its obligations under the Plan." Section 9.3 of the SERP further explains: "The provisions of the Plan shall govern the rights of a Participant to receive distributions pursuant to the Plan. The provisions of the Trust shall govern the rights of the Employers, Participants and the creditors of the Employers to the assets transferred to the Trust. Each Employer shall at all times remain liable to carry out its obligations under the Plan. Each Employer's obligations under the Plan may be satisfied with Trust assets distributed pursuant to the terms of the Trust, and any such distribution shall reduce the Employer's obligations under this Plan."

### (b) *Judgment and first implementation order*

The judgment at issue provides in pertinent part: "Judgment is entered as follows: [¶] 1. In favor of [Roden] in the amount of $5,000,000, less legally required deductions; [¶] 2. Continuation of the benefits provided in [subsections] 5(d), (e) and (i) of plaintiff's employment contract; and [¶] 3. Reasonable attorney's fees and costs in an amount to be determined by the Court."

In its June 7, 2001 order in implementation of judgment (the first implementation order), the court found: "A. The Employment Contract referred to in the Judgment was effective on October 15, 1995. With each month of service, the original three-year term was extended for one additional month. This provision has the effect of keeping a three-year remaining balance on the term at any given date until notice is given by either party that the extensions are to cease. The termination of Roden had the effect of such notice. At the date of his termination on November 3, 1999, the contract term extended to

November 30, 2002. [¶] B. The 'continuation of the benefits' under the various benefits and programs provided in [subsections] 5(d), (e) and (i) of the Employment Contract, set forth in [paragraph] 2 of the Judgment, had and has the effect of treating Roden as if he continued as an executive employee of Bergen for the balance of his contract term with respect to those benefits. [¶] C. The $5,000,000 payment under [paragraph] 1 of the Judgment did not include any of the benefits called for in [paragraph] 2 of the Judgment."

As for the particular benefits continued, subsection 5(d) of Roden's employment contract provides: "The Executive shall be entitled to participate in all employee health and benefit programs of the Company from time to time in effect for senior executives of the Company at the same level of importance as Executive as of the Effective Date, including, but not limited to, health, life, disability and dental insurance and retirement plan benefit programs, subject to a determination of Executive's eligibility under the terms of said plans and otherwise in accordance with their respective terms."

Subsection 5(e) of the contract pertains to an automobile allowance, not at issue in this appeal. Subsection 5(i) of the contract provides: "The Executive shall be entitled to receive and/or participate in all other benefits and programs made available, from time to time, to other senior executives of the Company at the same level of importance as Executive as of the Effective Date."

(c)  *Claims review*

On May 28, 2003, Roden made a demand for $23,391,608 in benefits under the SERP. On August 25, 2003, the plan administrator's claims official informed Roden of his determination that only $2,901,069 in benefits was owing. The claims official also informed Roden of his right to file an administrative appeal.

Roden's administrative appeal was heard by the Honorable Eugene F. Lynch, retired, as the review official. In his February 22, 2004 opinion, Judge Lynch determined that Roden was entitled to $2,952,527.34, plus interest. His decision was based in part on the conclusion that Roden was not entitled to either a change in control benefit or a double benefit under the SERP.

After receiving the decision of Judge Lynch, Roden pursued a second layer of review, by Wachovia Bank of North Carolina, N.A. (Wachovia). Wachovia was the trustee of the Master Trust Agreement. Wachovia determined that

Roden was entitled to $1,898,066 in SERP benefits. Its July 2, 2004 determination was based in part on the conclusion that Roden was not entitled to either a change in control benefit or a double benefit, under the provisions of the SERP. Wachovia tendered the $1,898,066 to Roden shortly after rendering its determination of the amount due.

### (d) *Judicial proceedings*

Roden thereafter filed a motion for a second order interpreting and implementing the judgment. He sought benefits under the SERP, a severance agreement, a stock option plan, and a loan forgiveness plan. Roden sought $45,012,134.38 in SERP benefits alone, plus interest from the August 29, 2001 merger date, and attorney fees and costs. He explained his view that he was entitled to a primary benefit of $14,432,141.74, plus a gross-up payment of $8,073,925.45 with respect to excise taxes, for a subtotal of $22,506,067.19. Roden further explained that he was entitled to double the $22,506,067.19 figure, for a total of $45,012,134.38, due to a SERP provision doubling benefits when the employer disputes an ultimately successful position taken by the plan participant. He acknowledged receipt of $1,898,066 from Wachovia in July 2004, and stated that amount should be credited, as of date of receipt, against the $45,012,134.38 due.

In its July 7, 2006 second order in implementation of judgment (second implementation order), the court awarded Roden $14,432,141.74 in SERP benefits, plus interest from August 29, 2001. It deemed the payment previously made by Wachovia to be a partial satisfaction of the judgment.

### (2) *Entitlement to Change in Control Benefit*

### (a) *Introduction*

Roden maintains that the court properly included within the $14,432,141.74 award an amount for change in control benefits, as allowed by subsection 5.1(b) of the SERP. Subsection 5.1(b)(i) of the SERP[2] provides

---

[2] Subsection 5.1(b)(i) of the SERP provides: "Notwithstanding any other provisions of the Plan, upon the occurrence of a Change in Control (as defined below), each Participant's Accrued Benefit shall [be] deemed to be fully Vested under the Plan and each Executive Participant shall be entitled to benefits under the Plan in accordance with the following: (A) As of the date of the Change in Control, such Executive Participant shall be deemed to have attained the Normal Retirement Age; (B) with respect to each year between such Executive Participants actual age as of the date of the Change in Control (if less than the Normal Retirement Age) and the Normal Retirement Age (the 'Interim Period'), such Executive Participant shall be deemed to have been continuously employed by the Company in, and to have continuously performed (without any Breaks in Service) the duties of, the position with the Company that such Executive Participant held as of the date of the Change in Control;

for a potential aggrandizement and acceleration of benefits for certain identified "Executive Participants" in the event of a change in control of Bergen, such as the merger that in fact took place. Section 2.21 of the SERP defines an "Executive Participant" as a participant holding the title of chairman of the board, chief executive officer, chief operating officer, president, senior vice-president, or executive vice-president as of the date of a change in control.[3]

Judge Lynch, in his administrative opinion, concluded that Roden did not hold any of the specified titles at the time of the merger, and therefore was not an Executive Participant entitled to change in control benefits under SERP subsection 5.1(b)(i). Wachovia, in its administrative determination, came to the same conclusion. It bolstered its analysis by stating: "Wachovia's decision to deny Mr. Roden's claim for [change in control] Benefits also is consistent with the primary purpose of change in control provisions, which is to protect those currently employed from the risk of losing their job as a result of the change in control. Change in control provisions are not designed to protect individuals, like Mr. Roden, who did not lose their job as a result of change of control, but were terminated for other reasons." (Fn. omitted.)

The trial court rejected the administrative decisions of both Judge Lynch and Wachovia, and concluded that Roden was entitled to the change in control benefit. AmerisourceBergen contends this was error, for two reasons. First, it says the point is res judicata, having already been decided in the first implementation order. Second, AmerisourceBergen claims the court erred in failing to defer to the administrative interpretations of the SERP change in control benefit. We reject both arguments, for reasons we shall explain.

---

(C) such Executive Participant shall be deemed to be entitled to Credited Service for all times during the Interim Period; (D) such Executive Participant's base salary as of the date of the Change in Control and the Executive Participant's highest average annual bonus amount received for any three years during the last five year period immediately preceding a Change in Control shall be used for the purposes of calculating the entire benefit under this Plan and the base salary and annual bonus amount (as calculated) shall be deemed to have increased at a rate of 4.0% per year each year during the Interim Period, resulting in a corresponding increase in the Executive Participant's Compensation for purposes of calculating a Participant's benefits under this Plan; (E) such Executive Participant's Accrued Benefit under this Plan shall be calculated in accordance with the assumptions set forth in the preceding clauses (A)–(D); and (F) prior to or upon the consummation of the transactions giving rise to the Change in Control, the Company shall pay to such Executive Participant, by certified or bank cashier's check, a cash lump sum payment that is the Equivalent of such Executive Participant's Vested Accrued Benefit determined in accordance with this Section 5.1(b)."

[3] Wachovia, in its administrative determination, asserted that a more restrictive version of SERP section 2.21, as amended in February 2001, should be applicable. However, it did not assert that a determination of the exact version of the SERP at issue was outcome determinative. Inasmuch as the parties do not address the point, we need not resolve it.

### (b) *Res judicata*

We address the res judicata argument first. When the trial court was preparing to enter its first implementation order, Roden submitted a proposed order that would have stated that the judgment had the effect of treating him "as if he continued as president and chief executive officer of Bergen for the balance of his contract term . . . ." The court did not adopt that language. Rather, in its first implementation order, the court stated that the judgment had the effect of treating "Roden as if he continued as an executive employee of Bergen for the balance of his contract term . . . ." According to AmerisourceBergen, this means that the court specifically considered and rejected an interpretation of the judgment to the effect that Roden would be treated as if he continued as president and chief executive officer for the remainder of his contract term. AmerisourceBergen says this court determination is dispositive, and no longer subject to challenge.

■ AmerisourceBergen cites *In re Matthew C.* (1993) 6 Cal.4th 386, 393 [24 Cal.Rptr.2d 765, 862 P.2d 765], wherein the court stated: "If an order is appealable . . . and no timely appeal is taken therefrom, the issues determined by the order are res judicata. [Citation.]" However, the issue of Roden's entitlement to benefits under SERP subsection 5.1(b) was not determined by the first implementation order. Indeed, neither the scope of the SERP benefits in general, nor the availability of the change in control benefit in particular, was before the court at the time it made its first implementation order. Nothing in that order purports to adjudicate those benefits.

To the contrary, the order identified certain SERP provisions, such as those on double benefits and attorney fees and costs, and stated that any ruling on those provisions would "have to await the occurrence of future events." At the time of the first implementation order, the merger had not yet taken place, so the interpretation of the SERP change in control benefits provision could not have been at issue. The merger was the type of future event the court necessarily could address only after its occurrence. The doctrine of res judicata does not bar Roden from raising the question of the availability of change in control benefits at this time.

### (c) *Deference to administrative decisions*

#### (i) *ERISA benefits determinations*

We turn now to AmerisourceBergen's deference argument. While the parties agree that the SERP is governed by the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. § 1001 et seq.), they nonetheless disagree as to the standard of review applicable to the administrative decisions at issue here. Roden insists that the court should undertake a de novo

review. AmerisourceBergen, on the other hand, maintains that the correct standard of review is abuse of discretion. Both parties cite *Firestone Tire & Rubber Co. v. Bruch* (1989) 489 U.S. 101 [103 L.Ed.2d 80, 109 S.Ct. 948] in support of their positions.

That case addressed the standard of review applicable to certain challenges to benefit denials under ERISA-governed plans, in particular challenges brought under 29 U.S.C. § 1132(a)(1)(B). (*Firestone Tire & Rubber Co. v. Bruch, supra*, 489 U.S. at p. 108.) That section "allows a suit to recover benefits due under the plan, to enforce rights under the terms of the plan, and to obtain a declaratory judgment of future entitlement to benefits under the provisions of the plan contract." (*Ibid.*) The *Firestone* court held "that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." (*Id.* at p. 115.)

Interpreting *Firestone Tire & Rubber Co. v. Bruch, supra*, 489 U.S. 101, the court in *Abatie v. Alta Health & Life Ins. Co.* (9th Cir. 2006) 458 F.3d 955, stated that "if the plan *does* confer discretionary authority as a matter of contractual agreement, then the standard of review shifts to abuse of discretion. [Citation.]" (*Abatie v. Alta Health & Life Ins. Co., supra*, 458 F.3d at p. 963.) "[F]or a plan to alter the standard of review from the default of de novo to the more lenient abuse of discretion, the plan must unambiguously provide discretion to the administrator. [Citation.] The essential first step of the analysis, then, is to examine whether the terms of the ERISA plan unambiguously grant discretion to the administrator. Accordingly, we first turn to the text of the plan." (*Ibid.*)

In the case before us, SERP section 7.5 unambiguously gives the plan administrator the discretion to construe the terms of the SERP and specifically states that an arbitrary and capricious standard of review shall apply. However, section 7.5 concludes with the following language: "This Section shall cease to apply upon the occurrence [of] a Change in Control . . . and it shall thereafter never be reinstated in any way."

Up until the time of the merger, then, the plan administrator clearly had a discretionary authority, under SERP section 7.5, that would have been subject to the abuse of discretion standard of review. Once the merger took place, however, SERP section 7.5 became inapplicable. AmerisourceBergen says that the provisions of the Master Trust Agreement then governed.

Section 2.1 of the Master Trust Agreement provides that the plan administrator is to direct the trustee in the administration of the trust until a change in control takes place. Upon a change in control, as section 2.2 of the Master Trust Agreement provides, "the authority of the Plan Administrator to administer the Trust and direct the Trustee . . . shall cease, and the Trustee shall have complete authority to administer the Trust." Regarding the scope of that authority, section 10.1 of the Master Trust Agreement states that "following a Change in Control, . . . the Trustee shall act on its own discretion to carry out the terms of this Master Trust Agreement in accordance with the Plans and this Master Trust Agreement." In addition, section 3.6(b) of the Master Trust Agreement provides in pertinent part: "Despite the foregoing, after a Change in Control, the Trustee shall make payments in accordance with the terms and provisions of each of the Plans and related plan agreements. The Trustee, . . . after a Change in Control, on its own volition, may make any distribution required to be made by it hereunder . . . ." According to AmerisourceBergen, these provisions endow the trustee with the requisite discretion to trigger the application of the abuse of discretion standard of review.

Roden disagrees. Just because a plan identifies a plan administrator's tasks, such as payments and distributions, that does not mean that the plan vests in the plan administrator the discretion necessary to trigger an abuse of discretion standard of review. (*Abatie v. Alta Health & Life Ins. Co., supra,* 458 F.3d at p. 964.) But here, we have more than just the enumeration of tasks. The Master Trust Agreement also gives the trustee the discretion to "carry out" the terms of the Master Trust Agreement. The question under *Firestone Tire & Rubber Co. v. Bruch, supra,* 489 U.S. 101 would be whether that language unambiguously gave the trustee the discretion to construe the terms of the SERP or to determine eligibility for benefits thereunder. (*Id.* at p. 115; *Abatie v. Alta Health & Life Ins. Co., supra,* 458 F.3d at p. 963.) AmerisourceBergen says "yes," because the Master Trust Agreement and the SERP are to be construed together, as one comprehensive benefits scheme. Roden says "no," because the trustee makes decisions only pertaining to the distribution of trust assets, not to the broader liabilities of AmerisourceBergen arising under the SERP.

Under the peculiar facts of this case, we need not resolve the issue. Here, we have a unique issue not present in *Firestone Tire & Rubber Co. v. Bruch, supra,* 489 U.S. 101. That case did not address the standard of review to be applied when the question is not the interpretation of a retirement plan provision, but rather the interpretation of a state court judgment encapsulating a Code of Civil Procedure section 998 settlement agreement, a postjudgment order implementing the judgment, or an appellate court opinion addressing both the judgment and the order.

(ii) *state court rulings*

This case does not turn on an interpretation of section 5.1 of the SERP, that is, the particular wording regarding change in control benefits. Rather, it turns on interpretations of the judgment, the first implementation order, and this court's opinion in *Roden I, supra,* 107 Cal.App.4th 620. The pivotal question in this case is whether any of those three rulings held that the SERP should be applied as though Roden were deemed to hold, or not to hold, the titles of president and chief executive officer throughout the remainder of his three-year term.

The trial court, in the second implementation order, concluded that the first implementation order had not specifically determined whether a change in control benefit was available under the judgment. The trial court also concluded that it had the authority to construe the judgment so as to make that determination. It then determined that Roden was entitled to a change in control benefit, because he was to be treated as though he continued to be employed as the chief executive officer throughout the remainder of his three-year term.

In rejecting the decision of Judge Lynch, the trial court stated that "Judge Lynch [had] no authority to interpret the rulings of this Court and in fact misinterpreted those rulings. His ruling was an abuse of discretion and was without authority." The trial court, in essence, determined that the administrative reviewer had no authority to bind the courts to an interpretation of the judgment. It was correct in this determination.

█ As we stated in *Roden I, supra,* 107 Cal.App.4th at page 624: "We apply general contract principles to the interpretation of a section 998 judgment. [Citation.] ' "[A] stipulation or consent judgment, being regarded as a contract between the parties, must be construed as any other contract. [Citations.] . . ." [Citation.]' [Citation.]" Unless the interpretation of a contract turns on the credibility of extrinsic evidence, the matter is a question of law. (*California Assn. of Professional Scientists v. Schwarzenegger* (2006) 137 Cal.App.4th 371, 382 [40 Cal.Rptr.3d 354].) We review the trial court's determination de novo. (*Ibid.*; *Lamantia v. Voluntary Plan Administrators* (9th Cir. 2005) 401 F.3d 1114, 1118.) We conclude, as we shall show, that the trial court correctly undertook to review the scope of the judgment, as a judicial function (*California Assn. of Professional Scientists,* at p. 382; *Lamantia,* at p. 1118), and correctly interpreted the judgment.

In *Roden I, supra,* 107 Cal.App.4th 620, we characterized the first implementation order as finding that "the way the employment agreement was written, once notice was given that Roden was terminated, his contract nonetheless continued for three years from that point. In other words, irrespective of whether Bergen chose to continue receiving Roden's services, he was treated as if he continued as an executive employee. Thus, he remained eligible for benefits under subsections 5(d), (e) and (i) [of the employment agreement]." (*Id.* at p. 633.) We resolved the issue before us by stating that the judgment entitled Roden to a $5 million lump sum plus the continuation of SERP benefits, the nature or extent of which we did not address. (*Ibid.*) We simply made clear, as did the first implementation order, that Roden was to be treated, with respect to eligibility for SERP benefits, as if his employment continued for an additional three years from the date of termination. We did not address, just as the first implementation order did not address, whether Roden would be treated as if his titles continued to apply. As the first implementation order specifically stated with reference to SERP benefits, the details of benefits eligibility were left for another time.

██ In order to determine the availability of change in control benefits, then, we turn to the provisions of the settlement agreement, as set forth in the judgment. " 'A contract must be "interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting" (Civ. Code, § 1636), and where, as here, the contract is in writing, "the intention . . . is to be ascertained from the writing alone, if possible . . . ." (Civ. Code, § 1639.)' [Citation.] In this case, it is not possible to ascertain the intent without looking outside of the settlement contract, to the employment agreement referenced therein." (*Roden I, supra,* 107 Cal.App.4th at p. 625.) "The language of the employment agreement is clear. Subsection 5(d) thereof specifically provides that Roden may participate in the company retirement plan benefit programs, and Bergen does not dispute that the benefit at issue is a retirement plan benefit." (*Id.* at p. 626.) The language of the employment agreement is also clear that Roden was employed for a rolling three-year term, such that his employment would continue for three years following receipt of a notice of termination. Therefore, Roden was entitled to participate in the SERP, as though he were still employed by Bergen, for an additional three years after he received that notice.

Roden served the company as president and chief executive officer, and, as the trial court in this matter said in its second implementation order, "[h]e was not demoted by virtue of the Judgment." In other words, the intent of the settlement agreement, and thus the judgment, was for Roden to be treated as though he continued to serve as president and chief executive officer, just as he would have done if he had not been terminated without cause.

Had Roden continued to serve out the three-year term, he would have held the titles of president and chief executive officer on the date of the merger. The plain language of the SERP would have entitled him to the change in control benefit. When Judge Lynch reviewed the judgment and the first implementation order, however, he misconstrued them to mean that Roden was not to be treated as though he continued to hold the titles of president and chief executive officer. He then applied the terms of the SERP based on this faulty construction. The trial court in the second implementation order correctly determined that Judge Lynch erred.[4] We affirm the portion of the second implementation order holding that Roden was entitled to change in control benefits under the SERP.

In doing so, we are mindful of AmerisourceBergen's argument concerning the purposes of a change in control benefit. As AmerisourceBergen points out, "The widely-accepted purposes for including Change [in] Control benefits in employee benefit plans [are] to (1) fend off hostile takeovers and (2) assure key employees that they will be fairly compensated in the event of a hostile takeover by depriving corporate raiders of the power to prevent such payment . . . ." (*Threadgill v. Prudential Securities Group, Inc.* (5th Cir. 1998) 145 F.3d 286, 295.) A related purpose " 'is to insure that key employees will be able to focus on their jobs during the hectic period associated with a potential takeover, rather than having to worry about how they will pay their bills if they lose their jobs.' " (*Id.* at p. 295, fn. 18.)

True enough, Roden was no longer actually serving as president and chief executive officer at the time of the merger. Therefore, some of the purposes of the change in control benefit are not served by making the benefit available to Roden. However, our concern here is with the purposes of the settlement agreement, as encapsulated in the judgment. One purpose was for Roden to receive whatever benefits he would have received had he continued to serve as president and chief executive officer for the remainder of his term. That purpose is served by permitting Roden to "cash in" in the same manner as he would have if he had not been terminated. Roden is entitled to the benefit of his bargain, no matter how sizeable that benefit turns out to be.

### (3) *Calculation of Change in Control Benefit*

Having determined that Roden was entitled to a change in control benefit under the SERP, we next look to the question of the amount of that benefit.

---

[4] The trial court, in the second implementation order, disregarded Wachovia's administrative decision, stating that "Wachovia was not part of the SERP benefit decision-making process." Whether or not this characterization of Wachovia's involvement was correct, we observe that the Wachovia decision, just like Judge Lynch's decision, was based on the faulty premise that Roden was not to be treated as though he continued to hold his titles during the remainder of the three-year term.

AmerisourceBergen claims that the court awarded Roden more than double the amount of money he was entitled to under section 5.1 of the SERP. Roden, on the other hand insists that the court awarded the correct lump sum principal amount.

Here, the SERP plan administrator, Judge Lynch, and Wachovia each omitted to determine how the language of subsection 5.1(b)(i) of the SERP should be interpreted in order to calculate the change in control benefit due Roden, because each of them determined that Roden was not entitled to the benefit at all. Therefore, at trial, the determination of the benefit was made by weighing the subsection 5.1(b)(i) language interpretations and resultant calculations of each party's expert witness.

The trial court adopted the findings of Roden's actuary, Adam J. Reese. In so doing, it impliedly rejected the findings of AmerisourceBergen's actuary, Julia A. Weyand. Weyand was a principal of Towers Perrin, which had provided actuarial consulting services pertaining to the SERP. Weyand herself had been performing actuarial services for the SERP since 1999. In 2001, she performed the change in control benefits calculations for seven Bergen executives, due to the merger. In support of her calculations of Roden's benefit, Weyand declared that she applied the same actuarial methodology and assumptions to the Roden calculations as she had to the calculations for those seven executives.

It is immediately apparent from a cursory review declarations of each of Reese and Weyand that they employed many different methodologies and assumptions in reaching their results. Reese reached a result of $14,432,141.74 for the lump sum principal amount. Weyand reached a result of $6,860,710. In her declaration, Weyand explained at length the many errors she perceived in Reese's methodology and assumptions. AmerisourceBergen chooses to focus its attention on only one.

According to AmerisourceBergen, 91 percent of the difference between Reese's figure and Weyand's figure had to do with the differing methodologies they applied to determine the actuarial equivalent of Roden's vested accrued benefit, pursuant to SERP subsection 5.1(b)(i)(F), the final step of the change in control benefit calculation. AmerisourceBergen claims that the change in control benefit was to be calculated as if, at the time of the merger, the Executive Participant had attained normal retirement age under the SERP, i.e., 62 years of age, but then after all the calculations of SERP subsection 5.1(b)(i)(A)–(E) were complete, the benefit was to be discounted to present value under SERP subsection 5.1(b)(i)(F) to take into consideration the fact that the Executive Participant, Roden, was in actuality only 54 years old at the time. However, Reese did not make this discount to present value.

Roden maintains that Reese was right. Roden focuses his attention on the first step of the calculation, embodied in SERP subsection 5.1(b)(i)(A), which states that "[a]s of the date of the Change in Control, such Executive Participant shall be deemed to have attained the Normal Retirement Age . . . ." As far as he is concerned, we need look no further. Roden insists that this SERP language is clear and answers the question. Since, as the first step of the change in control benefit calculation, the Executive Participant is deemed to have attained normal retirement age, the last step of the calculation cannot possibly be to take the Executive Participant's actual age into consideration and reduce the lump sum owing to present value. It would appear that the trial court was persuaded by this argument and looked no further, thereby avoiding an indepth analysis of other SERP provisions having to do with calculations and distributions.

AmerisourceBergen insists that the trial court clearly erred and, under any standard of review, should have adopted the utterly compelling viewpoint of Weyand. At the same time, it argues that the opinion of Weyand, as the actuary who had determined the change in control benefits for other Bergen executives, was entitled to deference. AmerisourceBergen emphasizes that SERP subsection 5.1(b)(i)(F), the last step in the change in control benefit calculation, states that the Executive Participant shall receive "a cash lump sum payment that is the Equivalent of such Executive Participant's Vested Accrued Benefit . . . ." AmerisourceBergen then draws our attention to SERP section 2.14, which defines the term "Equivalent" to "mean the actuarial equivalent of a given amount or benefit payable in another manner, at another time or by any other means, determined conclusively by, or under the direction of, the Plan Administrator in accordance with actuarial principles, methods and assumptions which are found to be appropriate by the Plan's actuary. . . ." AmerisourceBergen reads this language to mean that the court must defer to the interpretation of the SERP's actuary.

As we have already discussed, when an ERISA plan unambiguously confers discretionary authority on the plan administrator to determine benefits or to interpret plan provisions, we apply an abuse of discretion standard of review to his or her decision. (*Abatie v. Alta Health & Life Ins. Co., supra*, 458 F.3d at p. 963.) At this juncture, we are no longer talking about interpreting the provisions of either the judgment or the first implementation order—a judicial function. Now, we are talking instead about interpreting the complex SERP provisions concerning benefits calculations, based on certain actuarial principles, methods and assumptions. In this context, SERP section 2.14 clearly vests discretion in the plan administrator to determine the actuarial equivalent of the Executive Participant's vested accrued benefit under SERP subsection 5.1(b)(i)(F), based on principles, methods and assumptions proffered by the plan actuary. In short, the abuse of discretion

standard of review applies with respect to the plan administrator's determination of the actuarial equivalent in question. However, we have no plan administrator's determination to review. Because the plan administrator concluded that Roden was not entitled to a change in control benefit, it did not interpret the SERP provisions pertaining to the change in control benefit calculation.

■ It is tempting to adopt AmerisourceBergen's solution, that is, to apply the abuse of discretion standard of review to the opinion of its expert witness, inasmuch as she was the actuary who performed the calculations for others to whom a change in control benefit was owed. What better predictor could there be of how the plan administrator would determine Roden's benefit? However, it is the plan administrator in the first instance who must determine the benefit owing, based on information from the professional he or she hires at the time to perform actuarial services. (*Schadler v. Anthem Life Ins. Co.* (5th Cir. 1998) 147 F.3d 388, 397–398; *Vizcaino v. Microsoft Corp.* (9th Cir. 1997) 120 F.3d 1006, 1013–1014.) "[U]pon reflection we have determined that we should not allow ourselves to be seduced into making a decision which belongs to the plan administrator in the first instance." (*Vizcaino v. Microsoft Corp., supra*, 120 F.3d at p. 1013.) "We would set a poor precedent were we to intrude upon [the plan administrator's] exercise of discretion before he [or she] has even considered and ruled upon the issue. We would encourage the dumping of difficult and discretionary decisions into the laps of the courts, although one of the very purposes of ERISA is to avoid that kind of complication and delay." (*Ibid.*)

■ As much as we would like to resolve this litigation once and for all, " ' "[i]t is not the court's function *ab initio* to apply the correct standard to [the participant's] claim. That function, under the Plan, is reserved to the Plan administrator." ' [Citation.]" (*Vizcaino v. Microsoft Corp., supra*, 120 F.3d at p. 1014.) Accordingly, we must remand the matter of the change in control benefit calculation to the trial court with direction for it to further remand the matter to the plan administrator for determination in the first instance. (*Schadler v. Anthem Life Ins. Co., supra*, 147 F.3d at pp. 398–399; *Vizcaino v. Microsoft Corp., supra*, 120 F.3d at p. 1015.)

(4) *Excise and Income Taxes*

Roden also claims that the trial court erred in failing to award him $8,073,925.45 in excise and income taxes he says were due under subsection

5.1(b)(iii) of the SERP. That provision requires the payment to each Executive Participant of an amount equal to certain excise taxes "for which such Executive Participant is or may become liable . . ." due to the receipt of the change in control benefit, plus an additional amount equal to certain related income taxes.[5]

AmerisourceBergen responds with several arguments as to why, under the Internal Revenue Code and Treasury Regulations, no taxes should be due with respect to the change in control benefit. Roden takes issue with portions of AmerisourceBergen's tax analysis, but finds the analysis to be irrelevant in any event. He insists that the plain language of SERP subsection 5.1(b)(iii) requires payment to the Executive Participant of taxes for which the Executive Participant "may become liable," so that he is entitled to $8,073,925.45 in taxes if there is any theoretical possibility that he could ever be held liable for the tax. Roden emphasizes that the interpretation of the language of SERP subsection 5.1(b)(iii) is key.

While AmerisourceBergen would prefer that this court make the tax determination and resolve the matter, it concedes that a remand may be appropriate pursuant to *Schadler v. Anthem Life Ins. Co., supra*, 147 F.3d 388 and *Vizcaino v. Microsoft Corp., supra*, 120 F.3d 1006. AmerisourceBergen is quite right with respect to the remand. Again, inasmuch as the plan administrator determined that no change in control benefit was due, it did not interpret and apply SERP subsection 5.1(b)(iii) either with respect to the particular language Roden cites, or, we note, with respect to additional subsection 5.1(b)(iii) language pertaining to the determination of the matter by tax counsel. It is not for this court to interpret SERP subsection 5.1(b)(iii) and make the tax determination *ab initio*. (*Vizcaino v. Microsoft Corp., supra*, 120 F.3d at p. 1014.)

---

[5] SERP subsection 5.1(b)(iii) provides more fully: "In the event of a Change in Control, upon payment to each Executive Participant of the cash lump sum payment referred to in clause (F) of subsection 5.1(b)(i) above, the Company shall also pay to such Executive Participant . . . a cash lump sum payment equal to ([a]) the amount of excise tax for which such Executive Participant is or may become liable under Internal Revenue Code Section 4999 . . . with respect to the payments made under this Section 5.1(b) . . . plus (b) the amount of such Executive Participant's income tax liability arising from the Company's payment of the excise tax liability referred to in the preceding clause (a), such that the payments under clauses (a) and (b) taken together shall provide such Participant with sufficient after-income tax dollars to pay such Participant's liability for Internal Revenue Code Section 4999 excise taxes. . . . In the event that the Company and the Executive Participant are unable to agree upon the amount of the payment required under this subsection (iii), such amount shall be determined by Tax Counsel (as defined below). The decision of such Tax Counsel shall be final and binding upon both the Company and the Executive Participant. . . ."

As an aside, Roden, in his combined reply brief and opposition to AmerisourceBergen's cross-appeal, argues that the trial court erred in admitting the declaration of William Sprague, AmerisourceBergen's general counsel, into evidence. The Sprague declaration made reference to a tax opinion issued by PricewaterhouseCoopers in connection with the determination of change in control benefits paid at the time of the merger. AmerisourceBergen has filed a motion to strike new matters Roden raised for the first time in his combined reply brief and opposition. One of the items it asks this court to strike is Roden's challenge to the evidentiary ruling regarding the Sprague declaration. Inasmuch as we remand the tax issue to the trial court for further remand to the plan administrator, the issue of Roden's challenge to the evidentiary ruling is moot.

### (5) *Doubling of SERP Benefit*

Roden, displeased with the decision of the plan administrator, argued before Judge Lynch that he was entitled to have his SERP benefit doubled, because SERP subsection 10.8(b) provides for a doubling of the benefit owing if the employer disputes a participant's position and the participant ultimately prevails. Judge Lynch determined that Roden was not entitled to double benefits because subsection 10.8(b) was an invalid liquidated damages provision. Wachovia agreed that Roden was not entitled to double benefits under subsection 10.8(b). In the second implementation order, the trial court denied Roden double benefits on the basis that subsection 10.8(b) provided for unenforceable liquidated damages. Roden contends that the trial court erred in refusing to double his benefit due under the SERP. The issue of whether subsection 10.8(b) is unenforceable as a penalty is a question of law that we review de novo. (*Lamantia v. Voluntary Plan Administrators, supra*, 401 F.3d at p. 1121; *Harbor Island Holdings v. Kim* (2003) 107 Cal.App.4th 790, 794 [132 Cal.Rptr.2d 406].)

The provision at issue, SERP subsection 10.8(b), reads: "If the Employer disputes any position taken by a Participant under this Agreement and the Participant prevails, the Participant's benefit under this Plan shall be doubled and the increased amount shall become immediately due and payable to the Participant." Roden contends that the court, in the first implementation order, acknowledged the validity of this doubling provision. Hardly.

In the first implementation order, the court stated: "The provisions for attorneys' fees and costs and for doubling of benefits do not apply at this time. Should Bergen refuse to provide the SERP benefits after an election and

demand by Roden after November 30, 2002, these provisions may well apply. Any ruling on future conduct will have to await the occurrence of future events." To state that certain provisions may apply in the future, but are not ruled upon at the time, is not to state that the provisions have been reviewed and found to be enforceable. It is only to acknowledge their presence and to indicate that the question of their application is reserved for a later time. That later time has come with respect to SERP subsection 10.8(b).

Roden makes several additional arguments, which he bases on state law—apparently because of his viewpoint that this entire case has to do only with the enforcement of a state court judgment, not with any matters governed by ERISA law. However, we observe that both Judge Lynch and Wachovia considered federal law in evaluating the penalty issue. The trial court, in its second implementation order, did not indicate which body of law it applied. Without deciding whether federal law or state law is controlling with respect to the penalty issue, we simply respond to Roden's arguments as framed.

Roden argues that the trial court erred in holding that double benefits under SERP subsection 10.8(b) would constitute unenforceable liquidated damages, because Civil Code section 1671,[6] pertaining to liquidated damages, is inapplicable. As Roden sees it, that statute applies only to provisions of contracts, not provisions of judgments, and the doubling provision at issue is now part of the judgment.

In support of his position, Roden cites *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1766 [31 Cal.Rptr.2d 224]. In that case, the insureds obtained a judgment against their insurer in connection with the insurer's failure to pay a claim. (*Id.* at pp. 1768–1769.) The insurer filed an appeal and the insureds filed a second lawsuit, for bad faith refusal to pay the portion of the judgment representing contract damages. (*Id.* at p. 1769.) The trial court sustained the insurer's demurrer without leave to amend and the appellate court affirmed. (*Id.* at pp. 1768–1769.)

In so doing, the appellate court noted: "When a party recovers a judgment for breach of contract, entry of the judgment absolves the defendant of any further contractual obligations, and the judgment for damages replaces the defendant's duty to perform the contract. [Citation.] Upon entry of judgment, all further contractual rights are extinguished, and the plaintiff's rights are thereafter governed by the rights on the judgment, not by any rights which

---

[6] Civil Code section 1671, subdivision (b) provides that, with certain exceptions, "a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made."

might have been held to have arisen from the contract. [Citation.]" (*Tomaselli v. Transamerica Ins. Co., supra,* 25 Cal.App.4th at p. 1770.)

According to Roden, this means the matter before us is the enforcement of the judgment, not the enforcement of the provisions of the SERP. However, this is not a case in which a claim for insurance benefits was reduced to a money judgment. Rather, this is a case in which a Code of Civil Procedure section 998 settlement agreement was reduced to judgment, without interpretation by the court. (*Roden I, supra,* 107 Cal.App.4th at pp. 623, 630, fn. 3.) One of the barebones judgment provisions was for the "[c]ontinuation of the benefits provided in [subsections] 5(d), (e) and (i) of plaintiff's employment contract." Clearly, the judgment did not specify a sum then due and owing for section 5 benefits and did not absolve Bergen, now AmerisourceBergen, of further contract obligations. Just the opposite, it indicated that the provisions of the employment contract would continue to apply. Nothing in *Tomaselli v. Transamerica Ins. Co., supra,* 25 Cal.App.4th 1766 would make the laws pertaining to contract interpretation and enforcement inapplicable with respect to the continued section 5 benefits. Roden's argument that contract defenses are categorically unavailable to AmerisourceBergen fails.

■ Next, Roden argues that SERP subsection 10.8(b) cannot be a liquidated damages provision at all, because it is not triggered by a breach of contract. As he notes, this court has held that "to constitute a liquidated damage clause the conduct triggering the payment must in some manner breach the contract." (*Morris v. Redwood Empire Bancorp* (2005) 128 Cal.App.4th 1305, 1315 [27 Cal.Rptr.3d 797].) Yet we also have stated that "to determine the legality of a provision, we examine its true function and operation, not the manner in which it is characterized in the contract. [Citation.]" (*Id.* at p. 1314.)

Here, the contract term in question dictates that the SERP benefit shall be doubled when the employer disputes the participant's position and the participant ultimately prevails. In other words, it applies when the employer fails to pay the benefit the participant claims is due and the participant is finally determined to have been correct in his or her demand. Put into operation, when the employer breaches the payment and distribution terms of the SERP by failing to pay the benefit amount due thereunder, and the participant challenges the employer and ultimately prevails, SERP subsection 10.8(b) provides that the employer must pay a 100 percent penalty for the breach. Examining the true function and operation of subsection 10.8(b), we see that it is a penalty provision applicable in the event of a breach of contract for failure to timely pay benefits due under the SERP. Roden's argument fails.

### (6) *Prejudgment Interest*

In the second implementation order, the court awarded prejudgment interest on the $14,432,141.74 principal amount, at the rate of 10 percent per annum, from the date of the merger through the date of the order. AmerisourceBergen claims this was error. As AmerisourceBergen points out, the court did not articulate its reason for awarding prejudgment interest. AmerisourceBergen surmises that the court applied Civil Code section 3287, subdivision (a) in making the award, and argues that an award under that provision is improper.

Roden retorts that there could have been several statutory underpinnings for the award, not just Civil Code section 3287, subdivision (a). Roden asserts that the court could have awarded interest under either Civil Code section 3287, subdivision (b) or Code of Civil Procedure section 685.010, subdivision (a), as well. He claims that an award of interest would have been proper under any of these statutes.

These are issues we need not decide. Inasmuch as we reverse the portion of the second implementation order determining the amount of Roden's SERP benefit, and remand the matter to the trial court for further remand to the SERP plan administrator, we also reverse the award of interest on the SERP benefit.

### C. *SEVERANCE AGREEMENT:*

Roden further claims he was entitled to an award of $4,613,117.57 pursuant to the October 16, 1995 severance agreement between Bergen and himself. In its second implementation order, the trial court held: "Roden is not entitled to the benefit of the Severance Agreement as he was either terminated prior to the [change in control] or the Agreement doesn't apply to his termination under the Employment Contract." Roden maintains that the trial court erred. We disagree.

The purposes of the severance agreement were reflected in its recitals, which state: "1. The Company and Executive have heretofore entered into an employment relationship. The Company considers the continued services of Executive to be in the best interest of the Company and its shareholders and desires to assure the continued services of Executive on an objective and impartial basis and without distraction or conflict of interest in the event of an attempt to obtain control of the Company. [¶] 2. Executive is willing to remain in the employ of the Company upon the understanding that the Company will provide income security upon the terms and subject to the conditions contained herein if Executive's employment is terminated . . . involuntarily after a Change in Control . . . ."

In furtherance of those purposes, section IV, paragraph A of the severance agreement provides: "If Executive's employment with the Company is terminated after a Change in Control (i) by the Company other than For Cause . . . , within 180 days after a Change in Control, the Company shall pay to Executive within ten (10) days of the effective date of termination, a cash lump sum payment equal to the Severance Benefit Multiple multiplied by Executive's Base Amount . . . ." Regarding the manner of termination, section IV, paragraph B of the severance agreement states in pertinent part: "Any termination of Executive's employment by the Company . . . shall be communicated by a Notice of Termination . . . ."

As Roden readily admits in his opening brief, "[i]n November 1999, Bergen gave [him] notice of his termination without cause." (See also *Roden I, supra*, 107 Cal.App.4th at p. 623.) So, he received his notice of termination from Bergen more than a year before the merger took place in August 2001. Therefore, the termination was effectuated before the merger took place, not afterward. After the date of termination, Roden was treated as though his employment continued for the purpose of receiving certain benefits as enumerated in section 5 of his employment agreement. (*Id.* at p. 633.) That period of deemed employment expired in November 2002—after the date of the merger. Although the expiration of the period of deemed employment took place after the merger, the actual termination of employment occurred beforehand. Roden makes no argument that AmerisourceBergen delivered a notice of termination to him after the merger, so as to satisfy the termination requirements of severance agreement section IV, paragraphs A and B. The trial court did not err in its determination.

We have one closing point with respect to the severance agreement arguments. In its motion to strike, AmerisourceBergen requests this court to strike Roden's request for interest on the severance payment he claimed was due. Inasmuch as we affirm the trial court's ruling that Roden is not entitled to a severance payment, the issue is moot.

D. *STOCK OPTION ENTITLEMENT:*

Roden complains that, during the period of his deemed employment, AmerisourceBergen awarded stock options to its then serving senior executives but failed to make an award to him. He says that he was entitled to be treated as though he were still a senior executive and that, therefore, he was entitled to receive any stock options that other senior executives received. In addressing his argument, we turn to the language of the judgment and first implementation order.

The judgment made no specific mention of Roden's entitlement to stock options. However, as we have discussed, it did provide for the continuation of

benefits as provided in subsections 5(d), (e) and (i) of Roden's employment contract. Those subsections do not specifically identify stock options as being benefits Roden was entitled to receive. However, subsections 5(d) and (i) of the employment contract permitted Roden to participate in the same benefits programs as Bergen's other senior executives.

In the first implementation order, the trial court construed the judgment as follows: "The Judgment provides that Roden will continue to participate in the Bergen Stock Option Plans until November 30, 2002." The order further provided: "The Court makes no determination at this time as to whether Roden is entitled to benefits thereunder, since it would appear that Bergen's Compensation/Stock Option Committee has not met to consider and determine Roden's entitlement to stock options. The Court strongly suggests but does not at this time order, that the Bergen's Compensation/Stock Option Committee meet to determine whether Roden should receive any benefit under the Stock Option Plans in light of this Court's ruling that the term of Roden's employment is extended to November 30, 2002 and that the intent of [paragraph] 2 of the Judgment was that he be considered as if he continues as an executive employee during that time period. While the Court does not at this time circumscribe the manner in which the Compensation/Stock Option Committee should exercise its discretion with respect to any stock options to be awarded to Roden, the Court believes that its discretion must be exercised in good faith and suggests that Bergen's counsel advise such Committee of the law governing its actions."

Following the date of this order, the relevant committee addressed whether to provide stock option awards to Roden at least three times—in August 2001, September 2001, and April 2002. On each occasion it decided against making any award to him. This being the case, Roden took his demand for stock option benefits back to court. However, he was unsuccessful in his quest. In its second implementation order, the trial court stated: "Roden is not entitled to the stock options as he failed to show that the Committee acted without good faith."

Roden challenges that ruling. He agrees that a good faith standard applies to the committee's actions. However, he argues that the committee's decision to award stock options to other senior executives and not to him constitutes bad faith by definition, inasmuch as it is contrary to the mandate that he be treated like other senior executives during his period of deemed employment. Boiled down to its essence, Roden argues that the committee in fact had no discretion at all to fail to award him stock options during the three-year period of his deemed employment if it awarded stock options to any other senior executive during that time period.

In making this argument, Roden does not cite the provisions of any of the numerous stock option plans documented in the record. He does not discuss the operative provisions of any of these plans pertaining to the scope of the committee's discretion to make awards. He does not address the plan provisions pertaining to any criteria to be employed in determining whether an award shall be made to a given individual. Roden does mention one of the plans, the Bergen Brunswig Corporation 1999 Management Stock Incentive Plan, but only in the portion of his opening brief devoted to the particular terms of the stock options he seeks to receive. He does not address that plan's provisions concerning the entitlement to awards. AmerisourceBergen, on the other hand, draws our attention to section 18(c) of that plan, which provides in pertinent part: "No Eligible Individual or Participant shall have any claim or right to receive grants of Awards under the Plan."

Plan provisions notwithstanding, Roden simply insists that the committee had no discretion to deny him stock option awards because of his continued entitlement to the same benefits as other senior executives during the period of his deemed employment. Yet this argument is contrary to the first implementation order, which specifically stated that the determination of whether Roden was to receive stock options was to be made by the committee in its good faith discretion. Roden overlooks this portion of the first implementation order. Moreover, he has failed to cite any portion of the record showing bad faith on the part of the committee. The trial court did not err in its determination.

E. *LOAN FORGIVENESS ENTITLEMENT:*

The first implementation order did not resolve Roden's claim that he was entitled to loan forgiveness. That order stated: "(a) Roden's $337,500 loan was not absolved by the Judgment; [¶] (b) Since Roden's employment is considered to extend through November 30, 2002, the $337,500 obligation is due on November 30, 2002[;] [¶] (c) Bergen is required to accord Roden the same treatment as the other senior officers of Bergen who received loans from this November 1998 loan program . . . with respect to the $337,500 loan as to any forgiveness, extensions, payment of interest and the like." In other words, the order provided that the loan remained vital, but that it was subject to forgiveness to the extent that any other loans made through that loan program had been forgiven in favor of other senior executives.

In his motion for a second order enforcing the judgment, Roden asserted that his $337,500 company loan should indeed be forgiven, because AmerisourceBergen had forgiven comparable loans made to other members of management. In its May 8, 2006 tentative ruling, the court stated: "The Parties need to submit further evidence on the issue of the forgiveness of the

loan." At the May 8, 2006 hearing, Roden's counsel stated that his "reading of the proper way to address the loan issue under the circumstances" was to "address the loan issue . . . at a second or subsequent hearing on the matter." At the conclusion of the May 8, 2006 hearing, the next hearing was set for June 8, 2006.

On May 25, 2006, AmerisourceBergen filed a proposed joint statement regarding calculation of loan benefits claimed by Roden. AmerisourceBergen represented therein that Roden would neither join in the proposed statement nor provide a position statement for incorporation. It further represented to the court that all executives who had received loans under the same loan program as Roden had repaid them. Accordingly, AmerisourceBergen argued that Roden was obligated to repay his loan, just as the other executives had repaid theirs.

On May 26, 2006, Roden filed his statement on the calculation of damages. In that statement, he continued to argue that his $337,500 loan should be forgiven. He also made representations concerning loan programs made available to, and loans forgiven on behalf of, certain other executives. In support of his representations, Roden cited certain exhibits that had been filed on March 6, 2006, in support of his motion for a second order to enforce the judgment.

The second implementation order provided that the May 8, 2006 tentative ruling became the final ruling of the court with respect to the matters addressed therein. Also, in that order, the court found that Roden had not met his burden of proof with respect to his entitlement to loan forgiveness, inasmuch as he had not submitted any additional evidence on the matter.

Roden now complains that the trial court erred in stating in its May 8, 2006 tentative ruling that the parties should present additional evidence with respect to loan forgiveness, without setting a deadline therefor, and then simply denying his claim for loan forgiveness without giving him an opportunity to present his evidence. He argues that because the case needs to be remanded in any event, he should be given an opportunity to present further evidence on remand. However, Roden cites no authority in support of the proposition that the trial court erred in its ruling. Therefore, his argument is deemed waived.[7] (*Hess Collection Winery v. Agricultural Labor Relations Bd.*

---

[7] Certain aspects of the dispute between Roden and AmerisourceBergen have been on parallel tracks in the federal and state courts. The matter of Roden's $337,500 loan is one of those aspects. As reflected in the recent opinion of *AmerisourceBergen Corp. v. Roden* (9th Cir. 2007) 495 F.3d 1143, AmerisourceBergen has sued Roden in federal court alleging, inter alia, breach of contract with respect to the loan. In that opinion, the court of appeals held that the district court erred in dismissing the breach of contract claim. This opinion addresses only the

(2006) 140 Cal.App.4th 1584, 1607, fn. 6 [45 Cal.Rptr.3d 609] [argument waived when not supported by citation to authority].)

### F. ATTORNEY FEES AND COSTS:

#### (1) Attorney Fees

Roden complains that the trial court erred in failing to award him attorney fees and costs. He argues, among other things, that his entitlement to attorney fees and costs with respect to the trial court proceedings is the law of the case, given this court's prior rulings in *Roden I, supra,* 107 Cal.App.4th 620 and *Roden II, supra,* 130 Cal.App.4th 211. He is in error.

█ The doctrine of the law of the case "holds that where an appellate court states in its opinion a principle of law necessary to the decision, that principle becomes law of the case and must be adhered to in all subsequent proceedings, including appeals. [Citations.]" (*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn.* (1998) 60 Cal.App.4th 1053, 1064 [71 Cal.Rptr.2d 77].) However, for the doctrine to apply, " ' "the point of law involved must have been necessary to the prior decision, [and] the matter must have been actually presented and determined by the court . . . ." [Citations.]' [Citations.]" (*Ibid.*) In the case before us, the doctrine is inapplicable because the attorney fee issues the parties raise in this third appeal were neither presented nor determined in either of the prior appeals.

In *Roden I, supra,* 107 Cal.App.4th 620 and *Roden II, supra,* 130 Cal.App.4th 211, we determined Roden's entitlement to attorney fees and costs on appeal when he was clearly the prevailing party on appeal. We never addressed the entitlement to attorney fees incurred at the trial level in proceedings in which each party prevailed on some issues and lost on others. Furthermore, we did not address the legal arguments the parties now raise, such as AmerisourceBergen's argument that Civil Code section 1717 applies. Plainly, the doctrine of the law of the case does not govern the attorney fee issues now before us. Accordingly, we now address the parties' various issues on attorney fees.

Roden claims that he is entitled to attorney fees under several documents, including the judgment, the employment contract, the SERP, and the severance agreement. We address the judgment first.

In settlement of Roden's first amended complaint, Bergen offered to have judgment entered on three terms: (1) a $5 million award in favor of

---

loan forgiveness argument Roden has put before this court, not the breach of contract claim AmerisourceBergen has asserted in federal court.

Roden; (2) the continuation of certain benefits under Roden's employment contract; and (3) reasonable attorney fees and costs as determined by the court. (*Roden I, supra*, 107 Cal.App.4th at p. 625.) Judgment was entered accordingly. (*Ibid.*) Roden evidently construes the attorney fees provision to mean that he is entitled not only to attorney fees incurred with respect to the settlement and resulting judgment, but also to those incurred forever after, no matter the context. Roden has not demonstrated that it was the intent of the parties for him to be entitled to attorney fees in connection with all future litigation with AmerisourceBergen no matter what.

Here, Roden is seeking to obtain the benefits owing to him under subsections 5(d) and (i) of his employment contract. Given that, we take a look at the attorney fees provision contained in the employment contract. Subsection 13(d) of the employment contract provides in pertinent part: "The Company shall pay to the Executive all reasonable attorneys' fees and necessary costs and disbursements incurred by or on behalf of the Executive in connection with or as a result of a dispute under this Agreement, whether or not the Executive ultimately prevails. . . ." AmerisourceBergen argues this is the sort of unilateral fee provision to which Civil Code section 1717 applies. Bergen and AmerisourceBergen had no reason to raise this issue in either *Roden I, supra*, 107 Cal.App.4th 620 or *Roden II, supra*, 130 Cal.App.4th 211, because only Roden came out a winner in those cases. With each party winning some and losing some in the matter before us, there is now a reason to raise the application of that statutory provision.

Civil Code section 1717, subdivision (a) provides: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs. [¶] . . . [¶] Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit. [¶] Attorney's fees provided for by this section shall not be subject to waiver by the parties to any contract which is entered into after the effective date of this section. Any provision in any such contract which provides for a waiver of attorney's fees is void."

Roden claims that this statutory provision is inapplicable postjudgment, and that we should be looking instead to the application of Code of Civil Procedure section 685.040, regarding judgment creditor rights.[8] However, as

---

[8] Code of Civil Procedure section 685.040 provides: "The judgment creditor is entitled to the reasonable and necessary costs of enforcing a judgment. Attorney's fees incurred in enforcing a judgment are not included in costs collectible under this title unless otherwise

we have previously noted in connection with our discussion of *Tomaselli v. Transamerica Ins. Co., supra*, 25 Cal.App.4th 1766, this is not a case where, once the judgment was entered, all further contractual rights were extinguished. Rather, the judgment specifically provides for the continuation of certain employment contract benefits. "Here, [Roden] instituted the [underlying] proceeding as a means of enforcing [AmerisourceBergen's] contractual obligations under the [employment contract], as determined by the [first implementation] order and [the] judgment. . . . [W]e reject the . . . argument the [underlying] proceeding was beyond the ambit of the [employment contract's] attorney's fee provision." (*Share v. Casiano Bel-Air Homeowners Assn.* (1989) 215 Cal.App.3d 515, 523 [263 Cal.Rptr. 753].) Inasmuch as Roden is seeking to enforce contract terms that were kept alive by the judgment, Civil Code section 1717 continues to apply with respect to the attorney fees provision contained in that contract. (*Share*, at pp. 526–527.)

No doubt having Civil Code section 1717 in mind, the trial court, in the second implementation order, stated: "The Court finds that the right to attorney's fees is not exclusive to Mr. Roden and that both sides are entitled to attorney's fees on the issues on which they have prevailed and that neither party is the prevailing party for purposes of attorney's fees as any award to one would be offset by an award to the other."

As AmerisourceBergen points out, "the trial court ' "is given wide discretion in determining which party has prevailed on its cause(s) of action. Such a determination will not be disturbed on appeal absent a clear abuse of discretion." ' [Citation.]" (*Nasser v. Superior Court* (1984) 156 Cal.App.3d 52, 59 [202 Cal.Rptr. 552].) Furthermore, the trial court has the "power to determine that neither party prevailed. Requiring a determination for one party or the other in every case would encourage absurd results for if the court determines that neither party actually prevailed it would be unreasonable to award attorney fees." (*Ibid.*; see also *Hsu v. Abbara* (1995) 9 Cal.4th 863, 875–877 [39 Cal.Rptr.2d 824, 891 P.2d 804].) Here, "[s]ince the judgment 'must be considered good news and bad news as to each of the parties' [citation], we conclude the trial court's exercise of discretion was reasonable." (*Nasser v. Superior Court, supra*, 156 Cal.App.3d at p. 60.)

Roden contends that the court must look at which party prevailed under each individual contract, emphasizing that the SERP and the severance

provided by law. Attorney's fees incurred in enforcing a judgment are included as costs collectible under this title if the underlying judgment includes an award of attorney's fees to the judgment creditor pursuant to subparagraph (A) of paragraph (10) of subdivision (a) of Section 1033.5." Here, Roden is not looking to enforce the liquidated sum of $5 million awarded to him under the first paragraph of the judgment. Rather, he is looking to quantify, and obtain a new order regarding, continuing rights not previously liquidated to judgment.

agreement each contained substantially the same attorney fees provision as the one contained in the employment contract. He cites *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464 [54 Cal.Rptr.2d 888] in support of his position. In that case, litigation between a general contractor and its surety was tried in several phases. The first two phases involved the surety's claim for indemnification on certain contracts, and the surety recovered $813,000 in those phases. (*Id.* at pp. 471, 474–475.) The third phase pertained to the general contractor's claims in tort and breach of yet another contract. The general contractor prevailed in that phase, with a $16.5 million compensatory damages award. (*Ibid.*) The appellate court held that the trial court erred in determining that, by virtue of the net outcome of all trial phases, the general contractor was the prevailing party. (*Id.* at p. 490.) In remanding with respect to the determination of the prevailing party, the appellate court stated: "When an action involves multiple, independent contracts, each of which provides for attorney fees, the prevailing party for purposes of Civil Code section 1717 must be determined as to each contract regardless of who prevails in the overall action. [Citation.]" (*Id.* at p. 491.)

Roden maintains that the trial court in this matter erred by failing to apply the same approach, that is, to determine separately whether he is the prevailing party under each benefits contract. However, this case is distinguishable from *Arntz Contracting Co. v. St. Paul & Fire & Marine Ins. Co., supra,* 47 Cal.App.4th 464. Here, we do not have separate contractual claims tried in different phases. Rather, Roden is seeking an order enforcing the judgment provision regarding the continuation of benefits under subsections 5(d) and (i) of the employment contract. He has not filed separate contract actions on the SERP, the severance agreement, the stock option plans, or the loan programs. By virtue of the judgment, his rights at this point are limited to those arising out of the employment contract. The trial court did not err in declining to extend the rule of *Arntz Contracting Co. v. St. Paul & Fire & Marine Ins. Co., supra,* 47 Cal.App.4th 464 to the context before us.

That being said, because we are remanding the case with respect to certain issues which may affect the parties' rights hereunder, we reverse and remand the order on attorney fees, with a direction that the trial court reconsider the matter of the prevailing party in light of this opinion. In so doing, we do not preclude the trial court, in the exercise of its discretion, from again concluding that neither party is the prevailing party for the purposes of an attorney fees award.

(2) *Costs*

Roden makes the same arguments with respect to costs as he does with respect to attorney fees. However, he also argues that if this court fails to

award him costs under any of those arguments, he is still entitled to costs under Code of Civil Procedure section 1032. Code of Civil Procedure section 1032, subdivision (b) provides: "Except as otherwise expressly provided by statute, a prevailing party is entitled as a mater of right to recover costs in any action or proceeding." Code of Civil Procedure section 1032, subdivision (a)(4), in turn, states: " 'Prevailing party' includes the party with a net monetary recovery . . . . When any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not . . . ." According to Roden, the matter is simple enough. He has a net monetary recovery, so he is entitled to attorney fees as a matter of right under Code of Civil Procedure section 1032, subdivisions (a)(4) and (b).

■ However, despite the quoted language from Code of Civil Procedure section 1032, it has been held that "[e]ven under [that] section . . . , the court is not constrained to award attorney's fees to the party with the greatest net monetary recovery." (*Sears v. Baccaglio* (1998) 60 Cal.App.4th 1136, 1155 [70 Cal.Rptr.2d 769].) "Nothing in the statute limits the court's inquiry solely to net monetary recovery; to do so would be to ignore, among others, the problems presented by contract-derived claims against multiple parties and net recoveries which were actually Pyrrhic victories." (*Ibid.*) "While the trial court cannot arbitrarily deny fees to a less than sympathetic party, it remains free to consider all factors which may reasonably be considered to indicate success in the litigation." (*Ibid.*)

While the trial court in the case before us was within its discretion to order that each party bear its own costs, we nonetheless reverse that order and remand the matter of costs to the trial court for reconsideration, given the fact that we are remanding issues affecting Roden's recovery. We do so without prejudice to the trial court's making the same costs order again on remand.

## III

## DISPOSITION

The portions of the order holding that Roden was entitled to a change in control benefit, and that he was not entitled to a doubling of his retirement benefits, a severance payment, a stock option award, or loan forgiveness, are affirmed. The portions of the order concerning the amount of the change in control benefit and whether excise and/or income taxes are due under the retirement plan are reversed and remanded. We remand those issues to the trial court with directions to further remand them to the plan administrator for determination in the first instance. The portion of the order directing each

party to bear its own attorney fees and costs is reversed and remanded for further consideration in light of this opinion. Roden's motion to augment is granted. AmerisourceBergen's motion to strike is denied as moot. Each party shall bear its own attorney fees and costs on appeal.

Rylaarsdam, Acting P. J., and Fybel, J., concurred.

A petition for a rehearing was denied November 9, 2007, and the petition of appellant Donald R. Roden for review by the Supreme Court was denied January 23, 2008, S158430.